# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| SHEILA LAROSE, | No. 50858-3-II |
| Appellant/Cross-Respondent, | |
| v. | PUBLISHED OPINION |
| KING COUNTY, WASHINGTON, and PUBLIC DEFENDER ASSOCIATION aka THE DEFENDER ASSOCIATION (TDA), | |
| Respondent/Cross- Appellants. | |

MAXA, C.J. – Sheila LaRose appeals the trial court's dismissal of her hostile work environment, negligence, and disability discrimination claims against the Public Defender Association (PDA) and King County.

LaRose was a public defender for PDA, although eventually the County replaced PDA as her employer. PDA assigned her to represent "Mr. Smith"[1] on a charge of felony stalking. During the representation, Smith began making frequent, unwanted, and inappropriate phone calls to LaRose at work. LaRose notified her supervisors, but she decided to continue to represent Smith and her supervisors did not remove her from the case. After the representation ended, Smith's harassing and stalking behavior escalated until he was arrested and charged for his conduct. LaRose subsequently was diagnosed with post-traumatic stress disorder (PTSD), was placed on disability, and ultimately was discharged from employment because she was unable to work as a public defender.

---

[1] Because the details of LaRose's representation of her client are privileged, the parties refer to the man who stalked LaRose as "Client A" or "Mr. Smith." This opinion refers to the client as Smith.

LaRose filed a lawsuit against PDA and the County, alleging among other claims that her supervisors' handling of the situation with Smith had created a hostile work environment in violation of the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, that PDA and the County were negligent in failing to protect her from Smith's harassment, that PDA and the County deliberately injured her, and that the County discriminated against her based on her disability. The trial court dismissed the hostile work environment claim under CR 12(b)(6) and granted summary judgment in favor of PDA and the County on LaRose's remaining claims. LaRose appeals those rulings.

Before dismissing LaRose's claims, the trial court ruled on summary judgment that the County was vicariously liable for PDA's conduct. The County cross-appeals that ruling.

We hold that (1) the trial court erred in dismissing LaRose's WLAD claim because under certain circumstances, an employer may be subject to liability for a hostile work environment claim based on a nonemployee's harassment of an employee in the workplace; (2) the trial court erred in ruling that the Industrial Insurance Act (IIA), title 51 RCW, bars LaRose's negligence claims because a genuine issue of fact exists regarding whether her PTSD and related injuries constituted a compensable "injury" under the IIA; (3) LaRose did not present evidence that created a genuine issue of material fact that the IIA bar is inapplicable under RCW 51.24.020 based on her allegation that PDA and the County deliberately injured her; and (4) LaRose's disability discrimination claim fails because she did not present evidence that created a genuine issue of material fact regarding that claim. In addition, we hold that the trial court erred in ruling that the County is vicariously liable for PDA's conduct.

Accordingly, we reverse the trial court's order dismissing LaRose's hostile work environment claims and negligence claims, but we affirm the trial court's order dismissing

2

LaRose's disability discrimination claim. And we reverse the trial court's ruling that the County is vicariously liable for PDA's conduct. We remand for further proceedings consistent with this opinion.

FACTS

PDA operated as The Defender Association (TDA) and served as a contracted non-profit public defense law firm for the County from 1969 to June 30, 2013.[2] In July 2013, the County ended its contract with PDA and began directly administering the public defense program. Most PDA employees, including LaRose, became County employees effective July 1, 2013.

LaRose was employed by PDA as an attorney public defender beginning in 2009. She began her first rotation in the felony division in July 2012. While at PDA, LaRose did not receive any training, policies, or procedures for responding to sexual harassment or threats of violence from clients.

*Prior Smith Incident*

In June 2012, PDA public defender Rebecca Lederer was representing Smith on a felony stalking charge. Smith left Lederer a voicemail in which he repeatedly said that he loved her. Lederer asked her supervisor, Daron Morris, for permission to withdraw from Smith's case and for the case to be reassigned because she felt uncomfortable representing Smith. Morris recommended that the case be reassigned to another attorney because there was a good reason to believe that Smith would have trouble maintaining the proper professional boundary with his attorney if Lederer continued to represent him.

Lederer chose to withdraw and suggested that Smith be reassigned to a male attorney. Morris transferred the case to a male attorney.

---

[2] The organization changed its name from TDA to PDA when its contract with the County ended. Because PDA is the named party in this action, we refer to PDA rather than TDA.

*Smith's Harassment of LaRose*

On October 31, 2012, LaRose was assigned to represent Smith on a new charge of felony stalking. LaRose was not given any information about Smith's history of stalking professional women or his interaction with Lederer and was not warned of any potential danger in representing him.

In late March 2013, during LaRose's representation, Smith began to make repeated sexually motivated, harassing phone calls to LaRose at work. Smith told LaRose that he loved her, wanted to marry her, and wanted to be with her. By April, Smith was calling LaRose 10 to 20 times a day and making more disturbing sexual and offensive comments.

In April, LaRose met with her supervisor, Ben Goldsmith, and described Smith's harassing calls. She expressed her concerns about the calls and the fact that Smith would not stop calling despite her demand that he do so. LaRose stated that she thought she needed to get off the case. Goldsmith "said 'Okay,' in an irritated, dismissive, angry, impatient tone." Clerk's Papers (CP) at 177. A few days later after giving the matter some thought, LaRose told Goldsmith that she would try to finish the case because she was almost done with the representation. Goldsmith again said "Okay." CP at 179.

After that initial conversation, LaRose repeatedly went to Goldsmith and told him that the calls were continuing and getting worse and that she was concerned and worried about them. But she did not request that she should be taken off the case. And neither Goldsmith nor anyone else offered to reassign the case to another attorney.

In May, Smith's calls were continuing at the same rate. LaRose also received a handwritten letter from Smith with intrusive and sexually motivated content that frightened her. On May 24, LaRose met with Goldsmith and Leo Hamaji, another supervisor, to discuss the

letter and Smith's obsessive and offensive communications with her. Goldsmith and Hamaji did not remove LaRose from the case, relieve her from the obligation to be in frequent contact with Smith, or take steps to stop Smith from contacting her. LaRose also did not ask to be removed from the case.

On June 4, LaRose met again with Hamaji about the unwanted harassing phone calls. She described the nature of the calls, told him that they were becoming more inappropriate, and stated that she was having trouble sleeping. Hamaji told LaRose to ignore the calls. The constant offensive calls continued through June.

In July 2013, LaRose sought permission from the superior court to withdraw from representation of Smith pursuant to PDA policy when Smith requested a motion to withdraw his guilty plea. LaRose was allowed to withdraw on July 26. By the end of July, Smith's calls were continuing and escalating. LaRose went to Goldsmith at least three times and informed him that the calls were continuing. Twice he said nothing, and the third time he said, "I don't know – call the cops."

Smith continued to make offensive calls and comments after LaRose's representation ended. He pursued contact with LaRose inside and outside the office. Smith was released from custody in November 2013 and began following and making contact with LaRose in public. And the incessant calls continued. LaRose let Hamaji know that the unwanted sexual calls at work had not stopped.

LaRose estimated that she received over 1,000 calls from Smith between March 2013 and February 2014.

In February 2014, Smith jumped out at LaRose in the parking garage, left lingerie on her car, left literature in her mailbox, and came repeatedly to her house. He hid in her backyard,

5

appeared at her bedroom window in the middle of the night, and broke a bedroom window. He sent messages about seeing LaRose, her daughter, and a man who came to her home. LaRose sent emails to her County supervisors detailing these contacts.

Smith finally was arrested on February 21 and was charged with felony stalking. LaRose testified as the complaining witness at his trial. Smith was tried and convicted in January 2015 and was sentenced to seven years in confinement.

LaRose experienced a high level of stress and anxiety due to Smith's stalking behavior. She ultimately was diagnosed with major depressive disorder, generalized anxiety disorder, and PTSD. She was first diagnosed with PTSD in March 2015. LaRose requested medical leave in 2015 because her work continued to provoke stress and anxiety. The County granted her request. The County eventually terminated LaRose in 2017 when she was unable to continue working as a public defender.

*LaRose Lawsuit and Dismissal of Claims*

LaRose filed a lawsuit against PDA and the County, claiming that they had violated the WLAD by failing to provide a non-hostile work environment free of harassment and engaging in other discriminatory conduct. The County and PDA both filed motions to dismiss under CR 12(b)(6), arguing that they could not be liable as a matter of law for Smith's harassing conduct. The trial court granted the motions and dismissed LaRose's claim with prejudice.

LaRose subsequently filed an amended complaint, asserting claims for a violation of the special relationship duty to provide a safe workplace for employees, negligent infliction of emotional distress, disability discrimination, and a number of other claims in addition to a hostile work environment claim. PDA filed a motion to dismiss, arguing among other things that the WLAD claims already had been dismissed, the negligence claims were barred by the IIA, and

6

there could be no disability discrimination claim against PDA because LaRose had no disability while she was employed by PDA. The trial court dismissed the hostile work environment and disability discrimination claims against PDA, but it denied the motion with regard to the negligence claims.

The County and PDA later filed summary judgment motions with regard to LaRose's remaining claims, arguing that the IIA barred the negligence claims. They claimed that the IIA bar applied because LaRose's PTSD and other mental conditions were caused by individual traumatic events and therefore constituted an industrial injury that was compensable under the IIA. They submitted the deposition testimony of Dr. Stanley Shyn, LaRose's treating psychologist, who testified that certain conduct of Smith constituted traumatic events that were sufficient to support her PTSD diagnosis. The County also argued that summary judgment was appropriate on LaRose's disability discrimination claim against the County.

In opposition, LaRose argued that her injury was not an occupational injury compensable under the IIA. She presented declarations from Dr. Shyn, and a physician, Dr. Lawrence Wilson, who stated that her PTSD was caused by the cumulative effect of being stalked by Smith rather than any single event. LaRose also argued that the IIA did not bar her claims under RCW 51.24.020 because PDA and the County knew that her injury was certain to occur. Finally, LaRose argued that sufficient evidence supported her disability discrimination claim.

The trial court granted the summary judgment motions and dismissed LaRose's remaining claims.

The County also filed a motion for partial summary judgment on the issue of vicarious liability. The trial court denied the County's motion and ruled as a matter of law that the County was vicariously liable for the actions of PDA.

LaRose appeals the trial court's orders dismissing her hostile work environment, negligence, and disability discrimination claims. The County cross-appeals the trial court's ruling that the County is vicariously liable for PDA's conduct.

ANALYSIS

A.    STANDARD OF REVIEW

We review the trial court's ruling on a motion to dismiss under CR 12(b)(6) de novo. *Wash. Trucking Ass'n v. Emp't Sec. Dep't*, 188 Wn.2d 198, 207, 393 P.3d 761, *cert. denied* 138 S. Ct. 261 (2017). Dismissal is appropriate when it appears beyond doubt that a plaintiff will be unable to prove any set of facts that would justify recovery. *Id.* When ruling on a motion to dismiss, the trial court generally may consider only the allegations contained in the complaint and may not look beyond the face of the pleadings. *Jackson v. Quality Loan Serv. Corp. of Wash.*, 186 Wn. App. 838, 844, 347 P.3d 487 (2015).

If a court hearing a motion to dismiss considers matters outside of the pleadings, the motion must be treated as a summary judgment motion. *McNamara v. Koehler*, 5 Wn. App. 2d 708, 713, 429 P.3d 6 (2018), *rev. denied*, 192 Wn.2d 1021 (2019). Here, the trial court stated in its order granting the County's and PDA's CR 12(b)(6) motions to dismiss that it had considered numerous declarations in addition to the pleadings. Therefore, we review the trial court's decision on the motions to dismiss as a summary judgment decision.

We review a trial court's summary judgment order de novo. *Zonnebloem, LLC v. Blue Bay Holdings, LLC*, 200 Wn. App. 178, 182, 401 P.3d 468 (2017). We view all facts and reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Id.* Summary judgment is appropriate if there are no genuine issues of material fact and the

moving party is entitled to judgment as a matter of law. *Id.* A genuine issue of material fact exists if reasonable minds could disagree on the conclusion of a factual issue. *Id.* at 183.

The moving party bears the initial burden of proving that there is no genuine issue of material fact. *Id.* Once a moving defendant shows that there is an absence of evidence to support the plaintiff's case, the burden shifts to the plaintiff to present specific facts that rebut the defendant's contentions and show a genuine issue of material fact. *Id.*

B.      HOSTILE WORK ENVIRONMENT CLAIM

LaRose argues that the trial court erred by ruling as a matter of law that PDA and the County could not be liable under the WLAD for the harassing behavior of a nonemployee. She argues that the County and PDA were directly liable for the hostile work environment because PDA and the County knew about the harassment and failed to take adequate corrective action. We agree that under the circumstances here, PDA and the County may be subject to liability on a hostile work environment claim based on harassment of their employee LaRose by a nonemployee.

1.    Legal Principles

The WLAD states that "practices of discrimination against any [Washington] inhabitants . . . are a matter of state concern" and that "such discrimination threatens not only the rights and proper privileges of [Washington] inhabitants but menaces the institutions and foundation of a free democratic state." RCW 49.60.010. In addition, RCW 49.60.030 states that the right to be free from discrimination is a "civil right," which includes the right to hold employment without discrimination. And RCW 49.60.020 states, "The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof."

RCW 49.60.180(3) establishes that it is an unfair practice for an employer "[t]o discriminate against any person in compensation or in other terms or conditions of employment because of . . . sex." Under RCW 49.60.030(2), a person discriminated against in violation of the WLAD may bring a civil action.

One form of a sex discrimination claim is a hostile work environment claim. *Antonius v. King County*, 153 Wn.2d 256, 261, 103 P.3d 729 (2004). To establish a prima facie claim of a hostile work environment the plaintiff must show that "(1) the harassment was unwelcome, (2) the harassment was because of sex, (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer." *Id.* The Supreme Court first adopted this test in *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 406-07, 693 P.2d 708 (1985).

Regarding the fourth element of the *Glasgow* test, harassment will be imputed to the employer if "an owner, manager, partner or corporate officer personally participates." *Id.* at 407. An employer will be responsible for harassment by the plaintiff's supervisors or coworkers if the employer "(a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action." *Id.* A plaintiff can establish knowledge and failure to take adequate corrective action by showing

> (a) that complaints were made to the employer through higher managerial or supervisory personnel or by proving such a pervasiveness of sexual harassment at the workplace as to create an inference of the employer's knowledge or constructive knowledge of it and (b) that the employer's remedial action was not of such nature as to have been reasonably calculated to end the harassment.

*Id.*

2.    Liability for Nonemployee Harassment

*Glasgow* stated the rules for imputing harassment to the employer when a person involved with the employer's ownership or management or another employee harasses the

10

plaintiff. *Id.* The issue here is whether a *nonemployee's* harassment of the plaintiff can be imputed to an employer when the employer knew of the harassment and failed to take adequate corrective action. Even though PDA and the County argue otherwise, this issue is one of first impression in Washington.

LaRose argues that the same standard of employer liability should apply regardless of whether the person engaging in the harassment is an employee or a nonemployee: whether the employer knew about the harassment and failed to take adequate protective action. *See Glasgow*, 103 Wn.2d at 407. PDA and the County argue that *DeWater v. State*, 130 Wn.2d 128, 921 P.2d 1059 (1996), established that an employer can be liable for harassment by only an employee.

      a.   *DeWater*

In *DeWater*, the State licensed a foster parent to operate a group foster home. 130 Wn.2d at 130-31. The foster parent hired the plaintiff to assist in the group home. *Id.* at 131. The foster parent supervised the plaintiff and had sole authority to direct her work and terminate her, but the State paid the plaintiff's wages. *Id.* The plaintiff alleged that the foster parent subjected her to sexual harassment while she worked in the group home, and she filed a sexual harassment lawsuit against the State as her employer. *Id.* at 132-33.

The court summarized the standards of an employer's liability for a hostile work environment as set forth in *Glasgow*. *DeWater*, 130 Wn.2d at 135. The court noted that the fourth element was the only issue on appeal: whether the foster parent's harassment could be imputed to the State. *Id.* The court stated that where the harasser was not in management, "the employer is not held vicariously liable *unless the plaintiff shows that the person committing the harassment is an employee*" and the employer has knowledge and fails to take corrective action. *Id.* (emphasis added). PDA and the County focus on this language.

However, the court in *DeWater* repeatedly stated that the only issue on appeal was whether the State was "vicariously liable" for the foster parent's actions. *Id.* at 130, 133-34. The court explained that the State may be held vicariously liable if the foster parent was an employee, but not if the foster parent was an independent contractor unless the State had the right to control the manner in which the foster home as operated. *Id.* at 137. The court concluded that the foster parent was an independent contractor, not an employee, and that the State did not control the manner and means of operating the foster home. *Id.* at 137-41. Therefore, the court held that the State was not vicariously liable for the foster parent's actions. *Id.* at 141.

*DeWater* did not directly address the issue presented here: whether an employer is subject to liability for harassment in the workplace by a nonemployee. The court held that an employer could be "vicariously liable" only for the actions of an employee. *Id.* at 135. And the Supreme Court has recognized *DeWater* as a vicarious liability case. *See Aba Sheikh v. Choe*, 156 Wn.2d 441, 456-57, 128 P.3d 574 (2006). But LaRose does not argue that PDA and the County are vicariously liable for Smith's harassment. She argues that they are *directly* liable for failing to take corrective action once they learned of Smith's harassment.

The court in *DeWater* did not consider whether the harassment could be imputed to the State if the State had known about the foster parent's harassment and had failed to take corrective action. The plaintiff in that case argued that "the State knew or should have known of the hostile work environment because it had notice of an inappropriate sexual comment made to a caseworker at [the foster parent's] previous place of employment." *Id.* at 136. But the court did not discuss this allegation or whether knowledge of an independent contractor's harassment could subject an employer to liability.

b.  Other Washington Cases

No Washington case has addressed whether a nonemployee's harassment can be imputed to an employer. In *Antonius*, a corrections officer asserted a hostile work environment claim against a county based in part on sexual harassment by inmates. 153 Wn.2d at 259-60. However, the court only addressed whether the hostile work environment claim was timely. *Id.* at 261-73. The court did not consider whether the County could be liable for the harassment by the nonemployee inmates.

*Glasgow* did not address the issue presented here. The court stated the circumstances in which harassment by an employee could be imputed to an employer. 103 Wn.2d at 407. The court in *Glasgow* did not hold or even suggest that *only* an employee's harassment could be imputed to an employer.

c.  Federal Cases

LaRose relies on federal cases holding under federal law – Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e et seq.) – that employers may be liable for hostile work environments created by nonemployees.

In *Beckford v. Department of Corrections*, the Eleventh Circuit Court of Appeals stated:

> It is well established that employers may be liable for failing to remedy the harassment of employees by third parties who create a hostile work environment. In *Watson v. Blue Circle, Inc.*, we held that an "employer may be found liable for the harassing conduct of its customers if the employer fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known." 324 F.3d 1252, 1258 n. 2 (11th Cir. 2003). Uniformly, our sister circuits have applied the same rule that employers may be held liable under Title VII for harassment by third parties when that conduct creates a hostile work environment.

605 F.3d 951, 957-58 (11th Cir. 2010). The court cited to cases from eight federal circuits as support.

13

In *Little v. Windermere Relocation, Inc.*, the Ninth Circuit stated,

> In this circuit, employers are liable for harassing conduct by non-employees "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997); *see also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073 (10th Cir. 1998) (adopting *Folkerson* standard). The Equal Employment Opportunity Commission Guidelines endorse this approach: "An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees *in the workplace*, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e) (emphasis added).

301 F.3d 958, 968 (9th Cir. 2002).[3]

In *Dunn v. Washington County Hospital*, the Seventh Circuit stated, "Because liability is direct rather than derivative, it makes no difference whether the person whose acts are complained of is an employee, an independent contractor, or for that matter a customer. Ability to 'control' the actor plays no role." 429 F.3d 689, 691 (7th Cir. 2005).

The liability standard in these cases is almost identical to the standard in *Glasgow* for employees: whether the employer "(a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action." 103 Wn.2d at 407.

---

[3] The Missouri Court of Appeals adopted the same rule under state law:

> When an employee suffers discrimination by a third party who the employee comes into contact with because of the employment relationship, and the harassment . . . create[s] a hostile work environment, the employer breaches its duty if it knows or should have known of the discrimination and fails to take prompt and effective remedial action.

*Diaz v. Autozoners, LLC*, 484 S.W. 3d 64, 77 (Mo. App. 2015).

d.    Analysis

We conclude that *DeWater* does not control here.  The court's opinion does include the statement that harassment cannot be imputed to the employer "unless the plaintiff shows that the person committing the harassment is an employee." 130 Wn.2d at 135.  But that statement related to vicarious liability and addressed different facts.  *DeWater* does not compel the conclusion that LaRose has no hostile work environment claim against PDA and the County because Smith was a nonemployee.

Because *DeWater* is distinguishable, we must determine as a matter of first impression whether to allow a hostile work environment claim based on harassment in the workplace by a nonemployee under the same standards as for harassment by an employee.

Washington courts consistently look to federal case law interpreting federal discrimination statutes to aid in the interpretation of the WLAD.  *Kumar v. Gate Gourmet, Inc.*, 180 Wn.2d 481, 491, 325 P.3d 193 (2014).  "We have frequently recognized that while federal discrimination cases are not binding, they may be persuasive and their analyses adopted where they further the purposes and mandates of state law." *Antonius*, 153 Wn.2d at 266.

Relevant here, the Supreme Court has looked to federal cases interpreting Title VII when considering an issue of first impression regarding hostile work environment claims under the WLAD.  *See Robel v. Roundup Corp.*, 148 Wn.2d 35, 43, 59 P.3d 611 (2002).  And in *Antonius*, the court relied on federal authority to address the timeliness of a hostile work environment claim.  153 Wn.2d at 267-70.

As discussed above, the federal cases uniformly hold that a plaintiff can assert a hostile work environment claim under Title VII based on harassment in the workplace by a

15

nonemployee under standards that are consistent with Washington law for employee harassment. *E.g.*, *Beckford*, 605 F.3d at 957-58.

In addition, this rule furthers the purposes of the WLAD. The legislature recognized in RCW 49.60.010 that discrimination affects "the institutions and foundation of a free democratic state." RCW 49.60.030 establishes that the right to hold employment without discrimination is a civil right. And the WLAD must be liberally construed. RCW 49.60.020. Liberally construed, these broad provisions of the WLAD support a rule that employers may be subject to liability for harassment of their employees in the workplace, even harassment by nonemployees.

We adopt the federal rule and conclude that a nonemployee's harassment of an employee in the workplace will be imputed to an employer if the employer "(a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action." *Glasgow*, 103 Wn.2d at 407. Therefore, we reverse the trial court's ruling that as a matter of law PDA and the County could not be liable under the WLAD for the harassing behavior of Smith.

3.    PDA Liability on *Glasgow* Elements

PDA argues that even if LaRose can assert a hostile work environment claim based on Smith's harassment, the trial court properly dismissed that claim against PDA under the facts of this case. PDA contends that during the time it employed LaRose (until June 30, 2013), there was no evidence that would create a genuine issue of fact regarding element three or element four of a *Glasgow* hostile work environment claim. We disagree.[4]

---

[4] The County does not make this argument, and therefore we do not address whether summary judgment was appropriate in favor of the County's liability under the *Glasgow* factors.

First, PDA argues that LaRose did not present sufficient evidence to avoid summary judgment regarding the third element of the *Glasgow* test, that the harassment was sufficiently pervasive to affect the conditions of her employment before June 30, 2013. Factors for the court to consider in determining if a hostile work environment claim affects the terms and conditions of employment are the frequency and severity of the discriminatory conduct, whether the conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance. *Alonso v. Qwest Commc'ns Co.*, 178 Wn. App. 734, 751, 315 P.3d 610 (2013). Whether harassing conduct affects the conditions of employment generally is a question of fact. *Id.*

Here, by April 2013 Smith was calling LaRose 10 to 20 times a day and making disturbing sexual and offensive comments. The calls continued with the same frequency in May and June and were becoming more inappropriate. And in May, Smith sent LaRose a letter with sexual content that frightened her. We conclude that this evidence creates a genuine issue of fact that the harassment affected the conditions of LaRose's employment before June 30.

Second, PDA argues that LaRose did not present sufficient evidence to avoid summary judgment regarding the fourth element of the *Glasgow* test – imputation of harassment to PDA – because LaRose did not present evidence showing that PDA failed to take adequate corrective action after learning of the harassment. PDA relies on the fact that Goldsmith said, "Okay" when LaRose asked to be removed from Smith's case and that LaRose later decided to remain on the case. However, PDA made no affirmative efforts to do anything about the harassment once they became aware of it. We conclude that the evidence creates a genuine issue of fact whether PDA failed to take adequate corrective action after learning of the harassment.

17

4. Summary

We hold that LaRose can assert a hostile work environment claim against PDA and the County based on Smith's harassment of her. Smith's harassment of LaRose will be imputed to PDA and the County and they will be liable if they "(a) authorized, knew, or should have known of the harassment and (b) failed to take reasonably prompt and adequate corrective action." *Glasgow*, 103 Wn.2d at 407.

Here, LaRose has presented evidence that creates genuine issues of fact on these imputation requirements regarding both PDA and the County. There is evidence that both had notice of the harassment while they employed LaRose and whether they took adequate corrective action will be a question of fact for the trier of fact. In addition, LaRose presented evidence that creates genuine issues of fact on the other contested element of a hostile work environment claim regarding PDA, and the County does not argue that there are no genuine issues of fact regarding those elements. Therefore, we reverse the trial court's dismissal of LaRose's hostile work environment claim against PDA and the County.

C.    NEGLIGENCE CLAIMS – IIA BAR

LaRose argues that the trial court erred by ruling that the IIA barred her negligence claims – breach of a special relationship duty of care and negligent infliction of emotional distress – because a genuine issue of fact exists whether her PTSD and related injuries constituted a compensable "injury" under the IIA. She also argues that the IIA bar is inapplicable to her negligence claims under the intentional injury provision of RCW 51.24.020. We agree with the first argument and disagree with the second argument.

1. Applicability of IIA

a. Legal Principles

The IIA abolished all civil causes of action based on workplace injuries and abolished the superior court's jurisdiction over such causes of action. RCW 51.04.010. In other words, employers generally are immunized from negligence liability. *Carrera v. Olmstead*, 189 Wn.2d 297, 303, 401 P.3d 304 (2017). The IIA made workers' compensation benefits the exclusive remedy for claims based on workplace injuries and occupational disease. *See Dep't of Labor & Indus. v. Lyons Enters., Inc.*, 185 Wn.2d 721, 733, 374 P.3d 1097 (2016).

But the IIA does not bar a tort claim against an employer if a plaintiff's injury or disease arising in the workplace does not meet the IIA definition of an injury or an occupational disease. *See McCarthy v. Dep't of Soc. & Health Servs.*, 110 Wn.2d 812, 817, 759 P.2d 351 (1988); *see also Rothwell v. Nine Mile Falls Sch. Dist.*, 173 Wn. App. 812, 819, 295 P.3d 328 (2013). In other words, the IIA bar applies only if a claim is potentially compensable under the IIA. *Rothwell*, 173 Wn. App. at 819. As long as the IIA covers an injury or disease, the bar applies even if the claimant fails to meet the burden of proof on some component of the claim and therefore cannot actually obtain compensation. *McCarthy*, 110 Wn.2d at 824.

RCW 51.08.100 states that an "injury" is a "sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom." RCW 51.08.140 defines "occupational disease" as "such disease or infection as arises naturally and proximately out of employment."

The Department of Labor and Industries (DLI) adopted WAC 296-14-300, which addresses mental conditions and mental disabilities. WAC 296-14-300(1) states, "Claims based on mental conditions or mental disabilities caused by stress do not fall within the definition of an

19

occupational disease in RCW 51.08.140."[5]  The regulation provides multiple examples of such

mental conditions or mental disabilities, including conditions or disabilities arising from

relationships with the public.  WAC 296-14-300(1).

However, under WAC 296-14-300(2)(a), "[s]tress resulting from exposure to a single

traumatic event will be adjudicated as an industrial injury."  Examples of single traumatic events

include actual or threatened physical assault and actual or threatened sexual assault.  WAC 296-

14-300(2)(b).  And exposure to a single traumatic event is limited to directly experiencing the

event, witnessing the event happen to others, or "[e]xtreme exposure to aversive details of the

traumatic event."  WAC 296-14-300(2)(c).

WAC 296-14-300(2)(d) addresses multiple exposures to traumatic events.

> Repeated exposure to traumatic events, none of which are a single traumatic event
> as defined in subsection (2)(b) and (c) of this section, is not an industrial injury . . .
> or an occupational disease. . . .  A single traumatic event as defined in subsection
> (2)(b) and (c) of this section that occurs within a series of exposures will be
> adjudicated as an industrial injury.

WAC 296-14-300(2)(d).

Under RCW 51.08.100 and WAC 296-14-300(2), a mental condition can qualify as an

industrial injury "if the condition resulted from a sudden, tangible, and traumatic event that

produced an immediate result."  *Rothwell*, 173 Wn. App. at 819-20.  The event also must be " 'of

some notoriety, fixed as to time and susceptible of investigation.' "  *Id.* at 820 (quoting *Lehtinen*

*v. Weyerhaeuser Co.*, 63 Wn.2d 456, 458, 387 P.2d 760 (1963)).

A mental condition caused by long-term harassment may not qualify as an industrial

injury.  "The harassment suffered by [the plaintiff] did not occur suddenly or have an immediate

---

[5] RCW 51.08.142(1) directed DLI to adopt a rule "that claims based on mental conditions or
mental disabilities caused by stress do not fall within the definition of occupational disease under
RCW 51.08.140."

result; rather, it consisted of a series of actions over a period of more than a year which resulted in increasing fear and depression. It would therefore not qualify as an 'injury.' " *Wheeler v. Catholic Archdiocese of Seattle*, 65 Wn. App. 552, 566, 829 P.2d 196 (1992).

Whether a clamant has sustained an industrial injury is a question of fact. *See Rothwell*, 173 Wn. App. at 818-22 (analyzing whether there was sufficient evidence to create a genuine issue of material fact regarding the existence of an injury for purposes of the IIA bar).

> b. Injury Analysis

LaRose was subjected to repeated exposure to traumatic events over several months. The question here is whether within this series of traumatic events, LaRose was exposed to a "single traumatic event" and thereby sustained a compensable industrial injury as defined in RCW 51.08.100 and WAC 296-14-300(2).

PDA and the County focus on the deposition testimony of Dr. Shyn and Dr. Wilson. Dr. Shyn testified that LaRose experienced a number of traumatic events that supported the PTSD diagnosis.

> Q. And what was the sudden traumatic event that Ms. LaRose underwent?
> . . .
> THE WITNESS: So according to my note, Ms. LaRose was stalked by a former client. This individual camped out on her property, broke into the house, threatened to take her life, to kidnap her daughter, and that is what I felt represented the criterion A event here.
> . . .
> Q. Okay. So that would be the traumatic event?
> A. Yes.
> Q. The threat to her life?
> A. (Witness nods head).
> Q. Okay. And breaking into her house, is that a traumatic event?
> A. Yes.
> Q. Okay. And threatening her daughter -
> A. Yes.
> Q. -- is that a traumatic event?
> A. Yes.

Q. And threatening -- it also says to shoot her
ex-husband after a visit. Would that be considered a
traumatic event?
A. That can be, yes.

CP at 255-56.

Dr. Shyn also testified that one event involving Smith might be sufficient to support a

PTSD diagnosis.

Q. Would it be accurate that each one of those events could be adequate by itself
for the purpose of the diagnosis?
A. Without cataloging each and every one of those, yes, that is certainly possible.
Q. You don't necessarily need to have more than one of those events --
A. One is enough.
Q. -- to support your diagnosis. Is that correct?
A. Yes. One is enough.

CP at 258.

Dr. Wilson noted that LaRose described a number of incidents and events. He then was

asked whether "any one of those events might be sufficient to support PTSD," and he answered,

"I suppose so." CP at 247.

LaRose relies on the subsequent declarations of Dr. Shyn and Dr. Wilson, in which they

provided nearly identical opinions. Dr. Shyn stated:

17. It is my professional opinion, to a reasonable degree of medical certainty, that
the cause of Ms. LaRose' [sic] diagnosed conditions is the cumulative effect and
experience of the events and contributing factors generally described in Paragraphs
13-15 above.
18. In my professional opinion, where all of Ms. LaRose's medical treatment and
diagnoses took place after nearly two years of stalking related events, it is not
medically appropriate to try to single out any one event, as if it were separate from
the others, to determine whether that single event or point in time, was for Ms.
LaRose, by itself, a separate trauma which actually would have caused Ms.
LaRose's diagnosed Post Traumatic Stress Disorder, Major Depression, and
Generalized Anxiety Disorder.

CP at 647.

Dr. Wilson stated:

1.  In my deposition taken by counsel for King County and the TDA I was asked at pages 76-77 if I recalled Dr. Shyn's deposition testimony that any one of these events was sufficient to his diagnosis of PTSD of Ms. LaRose, between the event at the car or the event in the backyard for example. As I testified any one of them could be a cause of PTSD suffered by Sheila LaRose, although in this case we have numbers of incidents and events that are described by Ms. LaRose.
2.  It is my opinion, however, to a reasonable degree of medical probability that the cause of Ms. LaRose's diagnosed conditions is the combination of events – the cumulative effect and experience of the events and contributing factors experienced by Ms. LaRose.
3.  It is also my professional opinion, where all of Ms. LaRose's medical treatment and diagnoses took place after nearly two years of stalking related events, it is not medically appropriate to try and single out any one event, as if they were separate from the others, to determine whether that single event or point in time, was for Ms. LaRose, by itself, a separate trauma which actually would have caused Ms. LaRose's diagnosed Post Traumatic Stress Disorder, Major Depression, and Generalized Anxiety Disorder.

CP at 659-60.

The declarations of Dr. Shyn and Dr. Wilson create genuine issues of material fact on two issues. First, RCW 51.08.100 states that the traumatic happening must produce an "immediate or prompt result." Here, LaRose certainly was upset immediately by Smith's harassment. But she was not diagnosed with PTSD until March 2015. Even if certain singular traumatic events in 2013 and 2014 could be identified, there is a question of fact whether they produced an immediate result.

Second, both Dr. Shyn and Dr. Wilson opined that no one harassing event could be singled out from the others as the cause of LaRose's PTSD. These opinions arguably are inconsistent with Dr. Shyn's deposition testimony that certain conduct of Smith constituted traumatic events that were sufficient to support her PTSD diagnosis. But they create a question of fact whether one or more single traumatic events as defined in WAC 296-14-300(2) caused LaRose's PTSD and other mental conditions.

23

Because genuine questions of fact exist, we hold that the trial court erred in determining as a matter of law that LaRose suffered an industrial injury under RCW 51.08.100. Accordingly, we remand for the trial court to hold an evidentiary hearing on this issue.

c. Effect of LaRose's IIA Claims – Collateral Estoppel

LaRose filed a workers' compensation claim for psychological injury in April 2016. She had been diagnosed with PTSD in March 2015. Under the IIA, an injury claim must be filed within one year and an occupational disease claim must be filed within two years after the injury occurred. RCW 51.28.050 (injury); RCW 51.28.055 (disease).

DLI denied LaRose's injury claim because it was not filed within a year after the injury occurred and denied an occupational disease claim because LaRose's condition was not an occupational disease under RCW 51.08.142 and WAC 296-14-300. LaRose appealed DLI's decision to the Board of Industrial Insurance Appeals (BIIA). On appeal, LaRose stipulated that "this claim is brought exclusively as an occupational disease, and not as an 'injury' within the meaning of RCW 51.08.100." CP at 2884.

The BIIA affirmed DLI's decision. Both the proposed decision and order and the final order included a finding of fact that LaRose applied for benefits based on an occupational disease that caused PTSD and major depressive disorder "brought about by repeated exposure to traumatic events (none of which amounted to an Industrial Injury)." CP at 734, 739.

LaRose appears to argue that PDA and the County should be collaterally estopped from now claiming that she had a valid injury claim because the BIIA determined that she had not suffered an injury under the IIA. However, one of the elements of collateral estoppel is that the issue decided in the prior action was identical to the one presented in the second action. *Dot Foods, Inc. v. Dep't of Rev.*, 185 Wn.2d 239, 254, 372 P.3d 747 (2016). The BIIA did not rule

that LaRose did not have an injury claim; LaRose stipulated that she was not asserting such a claim. Therefore, collateral estoppel does not apply to whether LaRose suffered an injury under the IIA.

The BIIA's ruling that LaRose had not suffered an occupational disease may be binding in this action under collateral estoppel principles. However, PDA and the County do not argue on appeal that LaRose's PTSD and other mental conditions constituted an occupational disease. Further, LaRose appealed the BIIA's determination to superior court, which apparently ruled that she is entitled to a hearing on her IIA claim. LaRose concedes that her negligence claims are moot if she prevails on her occupational disease claim and is able to obtain workers' compensation benefits.

### d. Summary

Whether LaRose sustained an industrial injury as defined under the IIA must be determined by the trier of fact. If she did sustain an industrial injury, the IIA bar applies. In addition, if a final decision in LaRose's industrial disease claim ultimately determines that LaRose in fact suffered an industrial disease, the IIA bar will apply and the industrial injury issue will be moot.

### 2. RCW 51.24.020 – Deliberate Injury

LaRose argues that the IIA bar is inapplicable under RCW 51.24.020 because the evidence shows that PDA and the County deliberately injured her. She argues that a question of material fact exists as to whether PDA and the County had actual knowledge that an injury was certain to occur. We disagree.

Under RCW 51.24.020, a workplace injury is not barred by the IIA "[i]f injury results to a worker from the deliberate intention of his or her employer to produce such injury." *See*

*Michelbrink v. Wash. State Patrol*, 191 Wn. App. 414, 422, 363 P.3d 6 (2015). For the statute to apply, the employer must have a specific intent to injure the employee. *Birklid v. Boeing Co.*, 127 Wn.2d 853, 860, 904 P.2d 278 (1995). Neither gross negligence nor an act that has a substantial certainty of causing injury is sufficient to show an intent to injure. *Id.* The Supreme Court has expressly refused to equate deliberate intention to injure with substantial certainty that an injury will occur. *Id.* at 865.

To prove that an employer's actions fall within the deliberate intention exception an employee must demonstrate that "(1) 'the employer had actual knowledge that an injury was certain to occur' and (2) the employer 'willfully disregarded that knowledge.' " *Michelbrink*, 191 Wn. App. at 423 (quoting *Birklid*, 127 Wn.2d at 865).

LaRose argues that PDA intentionally injured her by assigning her to represent Smith given her supervisors' knowledge that he was a repeat stalker of professional women. She presented evidence that Smith had been charged with stalking professional women multiple times and that Smith previously had acted inappropriately toward a female defense attorney. Therefore, PDA may have known that assigning a man accused of stalking women to a woman defense attorney made mental injuries to LaRose possible or even foreseeable. But LaRose presented no evidence that PDA had any knowledge that mental injuries were *certain* to occur when they assigned her to represent Smith.

LaRose also argues that PDA and the County intentionally injured her by not removing her from Smith's case after he began harassing her. She presented evidence that she told her supervisors repeatedly that Smith was making harassing calls to her and that his offensive comments were escalating. At that point, PDA and the County may have known that mental injuries to LaRose were possible or even substantially certain to occur. But LaRose presented no

evidence that PDA or the County had any knowledge that mental injuries were *certain* to occur when they failed to remove her from Smith's case.

We interpret the deliberate intention exception narrowly. *Id.* at 426. And if a defendant shows that there is an absence of evidence to support the plaintiff's claim in a summary judgment motion, the burden shifts to the plaintiff to set forth specific facts that show a genuine issue of material fact. *Zonnebloem*, 200 Wn. App. at 183. LaRose has not presented specific facts to satisfy her burden here. Accordingly, we hold that RCW 51.24.020 does not preclude application of the IIA bar.

### 3. Evidence of Negligence

PDA and the County argue that even if the IIA bar does not apply, summary judgment was appropriate because LaRose cannot show that they breached any standard of care. PDA also argues that LaRose cannot establish proximate cause. We disagree.

### a. Legal Principles

To establish a negligence claim, a plaintiff must establish (1) the existence of a duty, (2) breach of that duty, (3) resulting injury, and (4) proximate cause. *Wuthrich v. King County*, 185 Wn.2d 19, 25, 366 P.3d 926 (2016).

In general a person has no duty to protect another from intentional harm by a third party. *H.B.H. v. State*, 192 Wn.2d 154, 168, 429 P.3d 484 (2018). However, an exception to this rule is when a special relationship exists between a person and another that gives the other a right to protection. *Id*; *see* RESTATEMENT (SECOND) OF TORTS § 315(b) (AM. LAW INST. 1965).

The employer-employee relationship is one that creates a duty to protect against a third party's criminal conduct. *Bartlett v. Hantover*, 9 Wn. App. 614, 620-21, 513 P.2d 844 (1973), *rev'd on other grounds*, 84 Wn.2d 426, 526 P.2d 1217 (1974).

> [A]n employer owes to an employee a duty to provide a safe place to work. The employer has a duty to make reasonable provision against foreseeable dangers of criminal misconduct to which the employment exposes the employee. Where the nature of the work is such that it exposes the employee to the risk of injury from the criminal acts of third persons, a jury question is raised as to whether the employer has been negligent in not foreseeing the risk of criminal acts and acting to protect employees against the danger.

*Bartlett*, 9 Wn. App. at 620-21 (citations omitted). The Supreme Court confirmed this duty in *Nivens v. 7-11 Hoagy's Corner*, citing *Bartlett* for the proposition that an "employer has a duty to make reasonable provision against foreseeable dangers of criminal misconduct to which the employment exposes the employee." 133 Wn.2d 192, 201, 943 P.2d 286 (1997).

b.    PDA Liability

LaRose claims that PDA was negligent in assigning her to represent Smith given his history of stalking. PDA argues that it had no reason to foresee that Smith would harass or stalk LaRose. However, the evidence LaRose presented that Smith had a history of stalking women and that he made inappropriate comments to another public defender that caused PDA to assign a prior case to a male is sufficient to create a question of fact on this issue. And PDA does not argue that there is no question of fact regarding proximate cause on this claim.

In addition, LaRose also claims that PDA was negligent in not removing her from Smith's cases once it learned of the harassment. PDA argues that it agreed to reassign the case after receiving notice of the harassment, but LaRose opted to continue representing Smith. However, given PDA's duty to protect LaRose, a genuine issue of fact exists whether PDA should have removed LaRose from the case regardless of LaRose's wishes.

PDA also argues that LaRose cannot establish that its failure to remove LaRose from the case proximately caused her harm. PDA claims that there is no way to determine whether removing LaRose from the case would have prevented Smith from stalking her. However, the

harassment only started in March 2013. The evidence showed that Smith's harassment continued to escalate and become more inappropriate over the next four months while LaRose continued to represent him. On the other hand, Smith did not continue to harass the prior public defender when she was removed from the case immediately after Smith made inappropriate comments to her. It is reasonable to infer for purposes of summary judgment that Smith's harassment would have stopped if PDA also had immediately removed LaRose from Smith's case.

We hold that PDA is not entitled to summary judgment on the merits of LaRose's negligence claims.

### c. County Liability

LaRose claims that the County was negligent in failing to remove her from the case after the County became her employer on July 1, 2013. The County argues that LaRose cannot establish any breach of the duty of care because the testimony of her liability expert should be excluded and without that testimony LaRose presented no evidence of breach.[6] However, the County knew when it became LaRose's employer that Smith had been harassing her for three months. Given the County's duty to protect LaRose, a genuine issue of fact exists whether it should have removed LaRose from the case in July 2013.[7]

There also may be a question of fact regarding whether the County should have done more to protect LaRose once Smith was released from incarceration in November 2013 and his stalking escalated. During that time, LaRose let Hamaji know that the unwanted sexual calls at

---

[6] The County does not argue that its failure to remove LaRose from the case proximately caused her harm. Therefore, we do not address proximate cause.

[7] We hold that a question of fact exists regardless of the liability expert's testimony. Therefore, we do not address the admissibility of that testimony.

work had not stopped. And LaRose sent emails to County management detailing Smith's stalking of her home. However, the record does not show what steps, if any, the County took to protect LaRose from this conduct.

We hold that the County is not entitled to summary judgment on the merits of LaRose's negligence claims.

D.     DISABILITY DISCRIMINATION CLAIM

LaRose argues that the trial court erred in dismissing her disability discrimination claim. She argues that summary judgment was inappropriate because there were genuine issues of material fact as to whether the County accommodated her disability and whether the County treated her differently because of her disability.[8]  We disagree.

1.     Failure to Accommodate

Under the WLAD, an employer has an affirmative duty to accommodate an employee's disability. *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wn. App. 765, 777, 249 P.3d 1044 (2011). The employee claiming failure to accommodate a disability has the burden of proving that (1) she suffered from a disability, (2) she was qualified to do the job in question, (3) she gave notice of the disability to her employer, and (4) the employer failed to reasonably accommodate the disability. *Slack v. Luke*, 192 Wn. App. 909, 917, 370 P.3d 49 (2016). However, "[t]he duty of an employer to accommodate reasonably an employee's disability does not arise until the employer is aware of the employee's disability." *Anica v. Wal-Mart Stores, Inc.*, 120 Wn. App. 481, 489-90, 84 P.3d 1231 (2004).

---

[8] LaRose also briefly argues that she was subjected to a hostile work environment because of her disability. However, she presents no evidence that a hostile work environment existed based on the County's response to her disability.

Here, LaRose was first diagnosed with PTSD in March 2015. LaRose submitted a medical leave request at that time, which the County granted. Later in 2015, LaRose requested that she not be assigned to new cases and for help in closing cases as she prepared to take a leave of absence. The County accommodated those requests.

LaRose argues that the County did not enter into an interactive process to accommodate her disability in 2013 and 2014. She argues that she was suffering increasing work-related stress and that her work was negatively affecting her mental health. However, LaRose's work-related stress does not qualify as an impairment under former RCW 49.60.040(25)(c)(ii) (2009). And the County did not have a duty to accommodate LaRose's disability until it was made aware of her medical diagnosis of PTSD in March 2015.

LaRose failed to meet her burden of creating a genuine issue of material fact regarding the County's failure to accommodate her disability. Accordingly, we hold that the trial court did not err in granting summary judgment in favor of the County on LaRose's failure to accommodate claim.

2. Disparate Treatment

LaRose also apparently argues that PDA and the County violated chapter 49.60 RCW by treating her differently based on her disability.

Under the WLAD, an employer is prohibited from discriminating against an employee on the basis of a disability. RCW 49.60.180; *see Blackburn v. Dep't of Soc. & Health Servs.*, 186 Wn.2d 250, 258, 375 P.3d 1076 (2016). An employee suffering from a disability can establish a claim of disparate treatment by showing that the employer took an adverse employment action and the action occurred under circumstances that raise a reasonable inference that the action

constituted unlawful discrimination. *Marin v. King County*, 194 Wn. App. 795, 808, 378 P.3d 203(2016).

Here, LaRose claims that her supervisors refused to engage with her and withheld support as she was dealing with the stress of her work. She claims that her supervisors transferred her to another division and failed to help her get coverage for upcoming cases so that she could take time off. However, the supervisors' behavior that LaRose complains of took place in 2014 and early 2015, before LaRose was diagnosed with PTSD.

LaRose failed to show a genuine issue of material fact regarding her disparate treatment claim. Accordingly, we hold that the trial court did not err in granting summary judgment in favor of the County on LaRose's disparate treatment claim.

E.    COUNTY'S VICARIOUS LIABILITY

The County argues on cross-appeal that the trial court erred in denying its motion for summary judgment on the issue of vicarious liability and ruling as a matter of law that it was vicariously liable for the conduct of PDA before July 2013. We agree.

1.    Legal Principles

In general, a principal is vicariously liable for the conduct of its "agent." *Wilcox v. Basehore*, 187 Wn.2d 772, 789-90, 389 P.3d 531 (2017). On the other hand, a principal is not vicariously liable for the conduct of an actor who can be characterized as an independent contractor. *Id.*

The crucial distinction between an agent and an independent contractor is whether the superior business party has the right to control the details of the subordinate business party's performance. *Id.* If the superior party does not have the right to control, the subordinate party is

an independent contractor. *Id.* at 790. Whether the superior party *actually* exercises control is immaterial as long as there is a right to control. *Id.* at 789.

Whether a party is an agent or an independent contractor can be determined as a matter of law if the facts are not in dispute and are subject to only one interpretation. *Id.* at 790.

2. *Dolan v. King County*

The trial court relied on *Dolan v. King County*, 172 Wn.2d 299, 258 P.3d 20 (2011), in determining that the County was vicariously liable for PDA's conduct. In *Dolan*, employees of the County's public defender organizations filed a class action lawsuit seeking to enroll in the state retirement system, PERS (Public Employees Retirement System). *Id.* at 308. The Supreme Court held that the public defenders should be considered the County's "employees" for purposes of PERS eligibility. *Id.* at 301.

The court stated that under the common law, the "bedrock principle" for distinguishing between employees and independent contractors is the right of control. *Id.* at 314. The court stated there was "no dispute that the defender organizations [had] autonomy to make day-to-day decisions on the representation of indigent clients." *Id.* at 307. But the court expressly rejected the County's argument that the focus should be on whether the County interfered with the defender organizations' day-to-day activities. *Id.* at 318. The court stated that because public defenders are guided by ethical responsibilities and constitutional obligations, "insistence on the traditional test of control over the details of the employee's day-to-day job performance is unworkable in this context." *Id.* at 318 n.15.

The court emphasized that a number of "examples of the county's right to control the defender organizations support our conclusion that, under common law principles, the defender organizations are in fact agencies of the county." *Id.* at 319. The court concluded, "[W]e hold

that the county has exerted such a right of control over the defender organizations as to make them agencies of the county." *Id.* at 320. As a result, the court held that employees of the defender organizations were county employees for purposes of PERS. *Id.*

However, the court indicated that its holding would not necessarily apply to whether the County was *vicariously liable* for conduct of the defender organizations. *Id.* at 320-21. The County argued that collateral estoppel applied based on a superior court's ruling in an unrelated case that a public defender was not a County employee for purposes of the public defender's wrongful termination claim. *Id.* at 320-21. The court in *Dolan* emphasized that the issue in that unrelated case was whether the County was vicariously liable for employment discrimination, while the issue in *Dolan* was whether public defenders were PERS eligible. *Id.* at 321. The court stated, "The cases are not comparable." *Id.* at 321.

3.   Analysis

    a.   Applicability of *Dolan*

LaRose argues that the County is vicariously liable for the conduct of PDA because the Supreme Court held in *Dolan* that PDA employees were employees of the County. But *Dolan* is not directly applicable here. The court's holding in *Dolan* was limited to the context of retirement benefits eligibility. The court expressly stated that whether a public defender was a County employee for PERS purposes was different than whether the County was vicariously liable for employment discrimination. *Dolan*, 172 Wn.2d at 321.

The Supreme Court has stated that a test to determine the nature of the relationship between a principal and a subordinate party, such as the right of control test, may reach two different results under the same facts depending on the purpose of deploying the test. *See Fisher v. City of Seattle*, 62 Wn.2d 800, 803-05, 384 P.2d 852 (1963). That is the situation here.

34

Although the inquiries into whether a public defender is entitled to PERS benefits and whether the County is liable for the PDA's conduct may both employ the right-of-control test, the two inquiries are distinct. Therefore, a conclusion in one context that the County exerted a right of control over PDA does not compel a conclusion that the County had a right of control here.

We conclude that *Dolan* does not control the vicarious liability determination. Therefore, we apply the right of control test to the facts here independent of the holding in *Dolan*.

> b. Control Test

Here, the County presented evidence that before July 2013, the supervision of attorneys, case assignments, and issues of case management were directed by PDA employees operating under PDA policies, without the County's involvement. LaRose does not dispute these facts. And LaRose presents no argument on this issue other than that *Dolan* controls. Even taken in the light most favorable to LaRose, these facts support the conclusion that the County did not control the manner of performance of PDA employees prior to July 2013. And there is no indication that the County had the *right* to control PDA's performance of its day-to-day duties. For vicariously liability purposes in the context of employment-based claims, we hold that PDA must be treated as an independent contractor rather than as an agent.

We conclude that the County is not vicariously liable for the conduct of PDA prior to July 2013. Accordingly, we hold that the trial court erred in denying the County's summary judgment motion.

F.     ATTORNEY FEES ON APPEAL

LaRose requests attorney fees on appeal under RCW 49.60.030. We may grant an award of reasonable attorney fees under RAP 18.1(a) if allowed under the applicable law.

A prevailing party may recover reasonable attorney fees on appeal under RCW 49.60.030(2). *Bright v. Frank Russell Invs.*, 191 Wn. App. 73, 86, 361 P.3d 245 (2015). However, although LaRose substantially prevails on appeal, the prevailing party in the case ultimately will be determined on remand. Therefore, we decline to award attorney fees to LaRose at this time.

## CONCLUSION

We reverse the trial court's order dismissing LaRose's hostile work environment claims, reverse the trial court's order dismissing LaRose's negligence claims, affirm the trial court's order dismissing LaRose's disability discrimination claim, and reverse the trial court's ruling that the County is vicariously liable for PDA's conduct. We remand for further proceedings consistent with this opinion.

MAXA, C.J.

We concur:

JOHANSON, J.

LEE, J.

36