# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| GILLIAN MARSHALL, | No. 56547-1-II |
| Appellant, | |
| v. | |
| THE STATE OF WASHINGTON, UNIVERSITY OF WASHINGTON, a State Agency, DIANE YOUNG, individually, JILL PURDY, individually, and MARK PAGANO, individually, | UNPUBLISHED OPINION |
| Respondent. | |

MAXA, J. – Gillian Marshall, a Black professor, appeals the trial court's grant of

summary judgment in favor of the University of Washington Tacoma, director of the School of

Social Work and Criminal Justice (SSWCJ) Diane Young, Executive Vice Chancellor Jill Purdy,

and Chancellor Mark Pagano (collectively, UWT).[1]  The case involves Marshall's allegation that

she experienced racial discrimination during her five-year employment as an assistant professor

at UWT, which culminated when she was denied promotion to associate professor, denied

tenure, and terminated.

We hold that the trial court erred in granting summary judgment in favor of UWT

regarding Marshall's racial discrimination and hostile work environment claims.  However, we

---

[1] Marshall, the other individual parties, and other professors involved in this case have earned a Ph.D.  We mean no disrespect in referring to them only by their last names rather than using the title "Dr." each time.

hold that the trial court did not err in granting summary judgment in favor of UWT regarding Marshall's retaliation claims. Accordingly, we affirm in part, reverse in part, and remand for further proceedings regarding the racial discrimination and hostile work environment claims.

FACTS

*UWT Merit Review, Reappointment, and Tenure Procedures*

UWT's merit review process, reappointment, and promotion procedures are outlined in the University of Washington's faculty code.

Under section 24-55 of the faculty code, faculty members are reviewed every year by their colleagues to determine their merit and to recommend whether to award a merit salary increase. The review involves consideration of the faculty member's cumulative record, including research, teaching, service, and their impact on the university. If a member receives two consecutive annual ratings of nonmeritorious, a committee of senior faculty convenes to more fully review that member's record and merit.

Under section 24-41 of the faculty code, assistant professor positions are for three years with an opportunity for reappointment to another three-year term. Reappointment occurs at the end of the assistant professor's second year and can be postponed for a year if the committee recommends, and then reappointment is considered after the third year. If the assistant professor is reappointed, a tenure decision must be made by the end of the second three-year term.

Section 24-34 of the faculty code states,

> Appointment to the rank of associate professor requires a record of substantial success in teaching and/or research. For tenured . . . appointments, both of these shall be required, except that in unusual cases an outstanding record in one of these activities may be considered sufficient.

Clerk's Papers (CP) at 3105.

In addition, Executive Order 45[2] notes that "an essential qualification for the granting of tenure or for promotion is the ability to teach effectively." CP at 3164. The order also states that consideration also should be given to "the way in which the candidate will fit into the present and foreseeable future of the academic unit." CP at 3166.

Section 24-32 of the faculty code states,

> In accord with the University's expressed commitment to excellence and equity, any contributions in scholarship and research, teaching, and service that address diversity and equal opportunity shall be included and considered among the professional and scholarly qualifications for appointment and promotion outlined below.

CP at 3102.

*Hiring of Marshall*

In 2014, the SSWCJ began the search to hire a new assistant professor. The SSWCJ had only one Black tenured faculty member, Marian Harris, and was looking to recruit more faculty of color. At that time, Young was the director of the SSWCJ.

Marshall applied for the assistant professor position. Young thought that Marshall was highly qualified. Young met with several qualified candidates, and four of the five top candidates were people of color. Young then lobbied successfully to hire two candidates instead of one, in part because of the chance to bring "very needed diverse perspectives" into the SSWCJ.

Young offered Marshall an assistant professor position. Marshall negotiated for a higher salary. Because Young wanted to entice Marshall to accept the offer, she agreed to increase the starting salary. Marshall accepted the offer, and was appointed as an assistant professor effective September 2015 for a period of three years.

---

[2] Executive orders are issued by the President of the University of Washington.

3

When Marshall applied, she was expecting a K01 grant from the National Institute of Health (NIH), which included over $1 million in funding over five years. Marshall was the first person in the SSWCJ program to receive a K01 award. The K01 award was a career development award and required Marshall to devote 75 percent of her time to research and 25 percent to teaching and service. Because of the requirement, Marshall was only required to teach one course per year. The normal course load was six classes.

Marshall had experienced issues with one of her other grants, so she decided to have her K01 award administered through the University of Washington's Seattle campus (UW Seattle). Young and UWT's grant administrators were surprised when they found out that the K01 award was being administered in Seattle. Young expressed that Marshall should not have done so without discussing it with her first. But Marshall explained that during her interview, Young and two other faculty members told her that new grants could be administered in Seattle. Young told Marshall that she was not happy with her about not being forthcoming and called her deceptive. Young attempted to have the K01 award transferred to UWT but was unsuccessful.

*2015-2016 Academic Year*

Marshall taught her first class in the 2016 Winter quarter. It was an undergraduate course, Introduction to Social Work. There were 19 students in the class, and 12 students submitted evaluations. In her evaluations, Marshall received a combined median score of 4.7 and an adjusted combined median score of 4.5 out of 5. Student comments reflected the positive evaluation scores Marshall received.

Marshall's performance for the 2015-2016 year was deemed meritorious, and she received a merit salary increase. Marshall's receipt of the K01 award was noted, as well as the fact that she was the first one in the history of the campus to receive the K01, she already had

two manuscripts accepted for publication with two more under review, and her teaching evaluations were positive.

*2016-2017 Academic Year*

In the 2017 Winter quarter, Marshall taught a graduate class, Human Behavior and Social Work II. There were 23 students in the class, and 17 students submitted evaluations. In the evaluations, Marshall received a combined median score of 2.8 and an adjusted combined median score of 3.3 out of 5. Student comments were mixed, but many students remarked that assignment expectations were very unclear and changed frequently. Students also noted that Marshall was unprepared for many classes and disorganized, and materials were uploaded late. Evaluations did note that Marshall was very kind, had great ideas to help them learn, was approachable, and knowledgeable.

During the quarter, Marshall invited an associate professor of education, Julia Aguirre, to observe one of her classes. Aguirre submitted a peer evaluation based on what she observed. Aguirre commented on "equity-based inclusive practices documented in the literature and present in . . . Dr. Marshall's teaching." CP at 2993.

Aguirre noted that as the students responded to Marshall's questions, Marshall effectively facilitated the activity and recorded each response ensuring everyone's voice was heard. Aguirre noted that Marshall's style of teaching was in sharp contrast to the traditional lecture style and promoted engaging participant driven discussions, reinforcing participants' prior knowledge. Aguirre wrote that Marshall created an environment that fostered critical and collaborative discussion.

Aguirre noted that Marshall's strength was in being able to facilitate complex discussions while meaningfully engaging students in critical thinking and collaboration. The discussions

reflected what the syllabus aimed to achieve. Aguirre concluded that Marshall's ability to facilitate such complex discussions and connect them to lived experiences of the students was "an exemplary model for faculty to learn from." CP at 2995.

*2017 Reappointment Review*

In April 2017, Marshall was up for reappointment for another three-year term as an assistant professor. The reappointment committee consisted of Harris, the other Black faculty member; Charles Emlet, Marshall's assigned mentor; and Karina Walters, a faculty member at UW Seattle.

The committee's report noted that Marshall had "a well-focused research trajectory that is congruent with the expectations of the [SSWCJ] and consistent with the University of Washington tenure and promotion policy." CP at 3040. The committee stated that it was "impressed with Dr. Marshall's solid and well-planned approach for future publications based on her funding awards." CP at 3040.

Regarding teaching, the committee noted that Marshall's evaluations for her undergraduate class were very positive but the evaluations for the graduate class were lower. However, the committee noted the favorable peer evaluation from Aguirre. The committee made eight specific recommendations on how Marshall could improve in this area, including working with a mentor.

The committee recommended renewal of Marshall's appointment. The committee's report stated, "The review committee feels that there is every reason to believe that Dr. Marshall will continue to be a productive scholar, continue her excellent teaching at the undergraduate level as reflected in her teaching evaluation and improve her teaching at the graduate level." CP at 3042.

However, the SSWCJ voting faculty was split in its voting regarding Marshall's reappointment: one voted to reappoint, two voted to postpone, and three voted not to reappoint. Because of the different recommendations of the reappointment committee and the voting faculty, SSWCJ acting director Tom Diehm (Young was on sabbatical) recommended postponing the reappointment decision until Spring 2018 so Marshall would have time to address the issues noted by the committee and the voting faculty.

Vice Chancellor Lavitt also recommended a one-year postponement because the faculty did not support Marshall's reappointment. She noted Marshall's lower evaluations from her graduate class, but observed that all faculty often struggle when teaching at a new institution for the first time. Lavitt also emphasized that research was an area of strength for Marshall. In conclusion, Lavitt hoped that "with additional time and evidence, [Marshall] will be reappointed as affirmation of her progress toward tenure." CP at 3039.

That same year, the SSWCJ voting faculty deemed Marshall's performance for the 2016-2017 year as nonmeritorious. Marshall did not receive a merit salary increase.

*2017-2018 Academic Year*

The following year, Marshall taught the same graduate course in the 2018 Winter quarter. There were 17 students in the class, and 11 students submitted evaluations. In the evaluations, Marshall received a combined median score and adjusted combined median score of 1.3 out of 5.

A majority of the student evaluations focused on Marshall's lack of preparation, unclear expectations, poor time management, and disorganization of the class. Students reported that Marshall's responses to questions were either vague or condescending. The evaluations consistently noted that Marshall knew the subject matter very well and was knowledgeable, but she did not deliver the information in an effective manner. The students expressed a desire to

have Marshall teach by sharing her thoughts, experiences, and wisdom that connected the materials to the real world.

Some students remarked that there was not enough lecturing and that they learned most of the material from answering questions in the book. One evaluation commented that Marshall cared about the students' learning and growth, but the disorganization of the course and shifting expectations made it difficult on nearly all the students who had other responsibilities outside of this class. One student wrote, "My experience with Dr. Marshall and this course felt like a complete waste of time, money, and effort. I honestly don't know what suggestions can be made for improving this class. I am just glad it's over." CP at 3023. Another student wrote, "Get a new teacher for this course." CP at 3024.

During the quarter, Marshall had Beth Kalikoff, an associate professor in writing studies at UWT, sit in on a class and evaluate it. Kalikoff sent a lengthy memo to Young regarding her observations. Kalikoff was impressed by Marshall's alternative approach to the traditional lecture style and found her course materials were crafted with care, clarity, and transparency. The day Kalikoff observed, she noted the "crisp organization" and students' engagement with the readings and activities. CP at 3001. The class was very interactive; most of the students spoke up in class discussions, responded to each other in a collegial way, and demonstrated professional maturity. The students had a reaction to a movie Marshall showed, which Marshall picked up on, stopped and had a meaningful dialogue about the moment. Kalikoff noted that this decision demonstrated "insight and moxie," both characteristics she saw in Marshall's teaching. CP at 3001.

Kalikoff also responded to the student evaluations Marshall received. In response to comments about disorganization, Kalikoff said that Marshall's class was "one of the best-

8

organized classes I've ever seen, and I've seen a lot of well-organized classes." CP at 3001. Kalikoff attributed the gap between her observations and the students' comments to their expectations of wanting a more traditional lecture. Kalikoff also attributed the gap to biases the students may hold because Marshall is a woman of color. She stated that "[w]omen of color can receive evaluations shaped by bias" and referred Young to research on the issue by assessment scholars at the University of Washington and endorsed by the Office of the Provost. CP at 3002-03. Kalikoff made two recommendations regarding student evaluations: "(1) value students' evaluations proportionately, and (2) weigh student evaluations in context, in light of peer review and self-assessment." CP at 3003.

Kalikoff ended her evaluation by noting that Marshall's "gifts as a teaching scholar are evident in her course and assignment development, her high standards, her determination to help students meet those standards," and that she is "well-organized, collegial, and well-prepared." CP at 3003. Kalikoff stated, "I learned a lot about the subject and about teaching." CP at 3003.

*2018 Reappointment Review*

In April 2018, after the previous postponement, a reappointment review committee consisting of Lavitt (now an SSWCJ faculty member), Emlet, and Taryn Lindhorst, a professor at the UW Seattle School of Social Work, addressed whether to reappoint Marshall. The committee stated that Marshall's success as a researcher was unequivocal and that her research was outstanding in both quality and quantity. The committee pointed out her tremendous success in securing funding and highlighted that Marshall had 15 publications, eight of which were published while she was at UWT. The committee stated, "There is no question that Dr. Marshall is building a reputation as a leading scholar in this area." CP at 3050. The committee

noted that "if [research] were the sole requirement for reappointment, then the decision would be an easy one." CP at 3050.

Regarding Marshall's teaching, the committee noted that because of Marshall's K01 award, Marshall had taught only three courses during her time at UWT. The committee acknowledged that there were only a few data points to demonstrate effective teaching. The committee stated that Marshall followed through on the recommendations given to her the previous year to improve her teaching. Marshall sought out experts to help in teaching, made extensive revisions to the syllabus, attended teaching workshops, and developed new strategies. Unfortunately, graduate students rated the 2018 class even lower than the 2017 class. The committee noted that this rating was an "extraordinarily low score" for SSWCJ faculty and a "surprising trend downward." CP at 3050-51.

But the committee acknowledged that student evaluations were only one measurement used to evaluate effective teaching, and that it was an imperfect measure. The committee believed, and Kalikoff's evaluation of Marshall's teaching confirmed, that student evaluations were subject to gender and racial biases. The committee believed that bias provided some explanation for the poor evaluations, as did Marshall's active learning style rather than a more traditional lecture style. The committee also noted that the two collegial assessments of Marshall's teaching both were positive.

The committee recommended that Marshall work in an ongoing manner with a tenured faculty member who has faced similar biases from student evaluations. They suggested that several women of color who have won teaching awards would be outstanding teaching mentors for Marshall. The committee emphasized that particularly in light of a recent survey of faculty of color that showed multiple experiences of bias and discrimination, "it is incumbent on the

10

institution to further invest in helping Dr. Marshall develop her expertise in the classroom." CP at 3051. They suggested that the director of the SSWCJ identify institutional resources for teaching support. The committee recommended Marshall's reappointment by a two to one vote.

Young subsequently sent a letter to Purdy, then the Executive Vice Chancellor of Academic Affairs, regarding Marshall's reappointment. Young reported that the SSWCJ voting faculty recommended by a five-to-two vote that Marshall not be appointed. The majority sentiment of the faculty was that "even with great research, extremely poor teaching and minimal service do not serve our students, program, and campus." CP at 3044. The faculty also disagreed that Marshall had worked hard to improve teaching, emphasizing that Marshall did not utilize support that was available to her.

Young concurred with the voting faculty and recommended that Marshall not be reappointed. Young believed that Marshall did not meet the expectations in teaching, which her successful research did not outweigh. Young acknowledged that she and the rest of the SSWCJ voting faculty believed that gender and racial bias in course evaluations were real, but saw no themes across the evaluations to indicate such a severe bias. She stated that Marshall's 2018 course evaluation score was the lowest by far during her six years as director of the SSWCJ.

Young also noted that the students' comments about Marshall's attitude, disorganization, and unclear communication were things that she and the faculty and staff also experienced in their interactions with Marshall. Young recommended that Purdy not reappoint Marshall.

After Young made this recommendation, Marshall met with Vice Chancellor Purdy and Chancellor Pagano. Marshall was presented with three options: (1) request that Purdy and Pagano disregard the faculty and Young's recommendations and reappoint her, (2) accept the decision not to reappoint and leave UWT after another year, or (3) resign from UWT. Marshall

11

refused to resign, stating in an email, "I would prefer to be treated with the same respect and dignity as a Caucasian faculty member." CP at 4293. Marshall concluded,

> You know or should know that the University of Washington's Tacoma campus suffers from ongoing institutional racism, inequity and unfair treatment of faculty of color which is well documented, and until that problem is addressed and solved, qualified persons of color, such as myself, will continue to be denied tenure track positions. You are in a position to bring an end to this problem. The decision is really yours not mine.

CP at 4293.

Vice Chancellor Purdy then reviewed Marshall's materials as well as the recommendation summaries. She concluded that Marshall would be reappointed with a mandatory promotion and tenure review to be considered in 2020-2021. Purdy noted the negative student evaluations and the positive peer evaluations of her teaching, and acknowledged that bias against women of color was a possible explanation for her low scores. And Purdy agreed that Marshall had demonstrated substantial progress toward meeting expectations for promotion and tenure regarding scholarship.

*2018 Merit Review Committee*

In the Fall of 2018, Young informed Marshall that her 2017-2018 performance was deemed nonmeritorious and she would not receive a merit salary increase. And because this was Marshall's second consecutive annual rating of no merit, the faculty code required a review process to more fully review Marshall's record and merit. The merit review committee consisted of SSWCJ professors Erin Casey, Michelle Garner, Lavitt, Eric Madis, and Randy Myers.

Marshall described to the committee that ever since she arrived at UWT she had experienced significant impediments to her success, which she attributed to her race. She reported, " 'I have experienced biased, unfair treatment and hostility which I believe accounts for an undeserved rating of non-meritorious.' " CP at 3065. Marshall noted that it was unclear why

she received a nonmeritorious rating the previous two years, as she had received no feedback or explanation.

The committee unanimously found that for the two years Marshall received a nonmeritorious rating that all the policies were properly followed. The committee upheld both of the nonmeritorious decisions. The committee also provided Marshall with recommendations to improve her ratings in teaching and service in the future.

In addition, the committee recommended that the SSWCJ review its merit policies because of the serious role racial bias plays in teacher evaluations and in the merit review process. The committee further noted Marshall's unique situation because of her K01 award and that there were no overt policies or procedures to specify expectations in research, teaching, and service. They believed that the policies should be updated to create transparency around these expectations because Marshall's situation differed from the standard course load per year.

*UCIRO Investigation*

Marshall told Vice Chancellor Purdy that she wanted an investigation done on discrimination she claimed she had faced. In August 2018, Chancellor Pagano initiated an investigation into Marshall's claims of discrimination with the University Complaint Investigation and Resolution Office (UCIRO). Beth Louie was assigned to investigate the behavior of Young and Diehm. Louie interviewed 20 different people over the course of her investigation. She also reviewed all of the University of Washington's policies concerning reappointment, merit reviews, course releases, and grant administration.

*Whistleblower Report*

Marshall noted that although the faculty code only stated nonmeritorious and meritorious categories for awarding merit, an "extra-meritorious" category was used in practice. Marshall

never received this rating and claimed that this extra rating was given to White faculty for monetary increases.

In December 2018, Marshall filed a whistleblower report with the state auditor's office. She reported that Young and other faculty violated the faculty code when it came to merit ratings. However, the auditor declined to open an investigation into the matter because it was better suited for a different agency.

*January 2019 Tort Claim*

In January 2019, Marshall filed a tort claim with the State of Washington. She stated that she intended to file a lawsuit against UWT because the campus suffered from institutional racism. She asserted the following claims: (1) intentional racial discrimination and racial harassment, (2) retaliation, (3) harassment in retaliation for opposing discrimination, (4) Young's aiding and abetting the discrimination, harassment, and retaliation, and (5) whistleblower retaliation. Marshall provided a very detailed discussion of what had occurred during her time at UWT.

When Marshall filed her tort claim, she was one of only two Black professors out of 22 faculty members in the SSWCJ. There was one Asian professor, and the rest were White.

*2018-2019 Academic Year*

In the 2019 Winter quarter, Marshall again taught the same graduate course. There were 18 students in the class, and 12 students submitted evaluations. In the evaluations, Marshall received a combined median score of 1.9 and an adjusted combined median score of 2.5.

Once again, student evaluations focused on Marshall's lack of organization, unclear expectations, and variable and late grading. One student said they had never taken a worse class because of the lack of organization. Another student described the class as "very chaotic." CP at

14

3028. Another comment stated, "This professor . . . is either not interested or incompetent. Immediate removal from this program is extremely necessary." CP at 3029.

Kalikoff again was invited to evaluate Marshall's teaching. Kalikoff sat in on the first day of class. She admired the way Marshall used class time to introduce herself, the course, the profession, and the students to each other. Students were engaged during introductions and took opportunities given to them by Marshall to speak and learn. Throughout the various activities, Marshall was clear and transparent. Kalikoff also liked the way Marshall handled student expectations of the course and thought that she was off to a terrific start.

In June, Young informed Marshall that the committee had a divided recommendation but the majority rated her as meritorious for the 2018-19 academic year. Young herself made a recommendation of nonmeritorious. Marshall was deemed meritorious and received a merit increase to her salary.

*Marshall Lawsuit Against UWT*

On September 30, 2019, Marshall filed a lawsuit against UWT, Young, and Diehm. Consistent with her January 2019 tort claim, Marshall asserted the following claims: (1) intentional racial discrimination and racial harassment, (2) retaliation, (3) harassment in retaliation for opposing discrimination, (4) Young's and Diehm's aiding and abetting the discrimination, harassment, and retaliation, and (5) whistleblower retaliation. She requested damages and "instatement to a tenured faculty position." CP at 39.

The litigation proceeded as Marshall continued to work at UWT.

*UCIRO Investigation Results*

In October 2019, Louie revealed the results of her UCIRO investigation. She looked at whether there was evidence of discrimination, harassment, or retaliation in Marshall's

15

reappointments, merit reviews, and grant administration. The investigation did not reveal that any of the teaching evaluations and decisions based on them were motivated by race or discrimination. Louie determined that the 2017 decision to postpone reappointment was due to the split between the committee and faculty vote and the concerns around teaching and service. Louie also found no discrimination during the 2017, 2018, and 2019 merit reviews. Louie concluded that none of the University's non-discrimination, non-harassment, or non-retaliation policies were violated.

However, the investigation revealed that in the 2017 and 2018 reviews, the committee was confused around the 75 percent of time spent on research required by the K01 award and what that meant in practice. Louie pointed out that a conversation regarding the K01 requirements should have happened in the beginning when Marshall started.

*2019-2020 Academic Year*

In the 2019 Fall quarter Marshall once again taught the undergraduate course Introduction to Social Work. There were 37 students in the class, and 33 students submitted evaluations. In the evaluations, Marshall received a combined median score of 4.0 and an adjusted combined median score of 4.1. This course did not have qualitative comments, only quantitative ratings. The course was well-rated by the students, with many of the categories being rated 4 or 5.

Deirdre Raynor, professor of American ethnic literature at UWT, sat in on and evaluated the class. Raynor sent an email to SSWCJ Acting Dean Marcie Lazzari to report her observations. The first thing Raynor noted was how well organized the class was and the range of methods Marshall used to engage the students. All the students in the class were engaged during the lecture. During a break in the class, a number of students talked to Marshall and she

gave them her undivided attention, giving them resources to enhance their learning and treated them with respect. Students felt like they were getting a great introduction into social work and that they planned to take more classes in the area because of Marshall.

In June 2020, Acting Dean Lazzari informed Marshall that she received three votes for meritorious, three for non-meritorious, and one abstention, and noted that Marshall was making progress in all domains. Despite the split, Marshall was deemed meritorious.

*2020 Tenure and Promotion Review*

In June 2020, Marshall applied for tenure and promotion. Marshall provided for consideration extensive discussion and documents regarding her research, teaching, achievements, service, and four external peer reviews of her research and scholarship. Two of the external reviewers were chosen by the SSWCJ committee and two were chosen by Marshall.

The reviewers all provided very positive comments about Marshall's research and scholarship. One reviewer stated, "Without any doubt, Dr. Marshall is an impressive scholar who has made significant contributions to the social work profession." CP at 2979. Another reviewer stated that Marshall's "quantity and quality of work place her in the top 10-15% of Assistant Professors in gerontology across the social and behavioral sciences." CP at 2987.

*SSWCJ Tenure Review Committee*

The first step in the tenure review process was consideration by the SSWCJ tenure review committee, which consisted of four SSWCJ professors. All four members voted to deny Marshall promotion and tenure.

Jeff Cohen, the review committee chair, explained the committee's recommendation in a detailed, eight-page report dated October 9, 2020. The report opened with the following statement:

17

> While at UW Tacoma, Dr. Marshall has established herself as a strong researcher with a *growing national reputation* in the areas of social work, gerontology, public health and economics. She has built a research agenda that cuts across and integrates multiple disciplines and addresses important dynamics related to health disparities as influenced by race, ethnicity, socioeconomic status, and age.

CP at 2918 (emphasis added). However, the committee noted that Marshall was less successful in the classroom. The committee concluded that Marshall did not meet expectations in the area of teaching, and that the totality of her record did not warrant promotion with tenure.

The committee acknowledged the positive evaluations from Marshall's undergraduate classes and the four positive collegial evaluations of Marshall's teaching. But the committee noted serious concerns related to Marshall's teaching, pointing out her low teaching scores for the three times she taught the graduate classes. These were "exceptionally low scores" in the SSWCJ and in UWT as a whole. CP at 2920. The committee stated, "While racial and gender bias are undoubtedly also among the factors at play, the committee believes that these factors collectively are unlikely to fully account for the unusually low nature of these scores." CP at 2920. They also pointed to the numerous negative qualitative evaluations regarding Marshall's teaching.

The committee noted that they faced several "tensions" in assessing Marshall's teaching: (1) poor student evaluations versus positive collegial ones, (2) weighing success in undergraduate versus significant challenges in graduate courses, (3) the small number of classes taught, and (4) the lack of clarity around Marshall's expected teaching load. They also considered the role of gender and racial bias. However, it was the committee's unanimous assessment that "Marshall's record of teaching does not meet the department's criteria for tenure

18

and promotion, nor does it meet the Faculty Code's threshold of 'substantial success' in teaching as a pre-requisite for tenure and promotion." CP at 2921.

Regarding research, the committee unanimously agreed that the quantity and quality of Marshall's research met expectations for tenure and promotion. The report noted that Marshall had published a total of 14 peer reviewed journal articles (six in which she was the first or sole author), with four additional manuscripts under review. She also had given 13 refereed conference presentations. And the committee stated that the K01 grant was a "prestigious career award." CP at 2922. However, the report concluded, "The committee is in agreement in its determination that Dr. Marshall's record of research does not meet the Faculty Code's threshold of 'outstanding' needed to outweigh what are very clear deficiencies in the area of teaching, which is a vital aspect of faculty responsibilities at UW Tacoma." CP at 2925.

*SSWCJ Voting Faculty Recommendation*

The next step in the process was the recommendation of the SSWCJ voting faculty. The faculty voted to deny tenure and promotion to Marshall. There were seven negative votes, no positive votes, and two abstentions. SSWCJ Acting Dean Lazzari provided a summary of the faculty's recommendation in a report dated November 3, 2020.

The faculty cited Marshall's problematic teaching scores and the nature of qualitative comments in graduate level courses. Her low scores were "unheard of across the UW Tacoma campus." CP at 2902. And while Marshall received positive comments in undergraduate courses, the course was taught for non-majors. Colleagues in the SSWCJ did not have a problem with Marshall's reduced course load, but with her poor quality of teaching.

The faculty noted that while Marshall received positive peer evaluations, none of the evaluations were conducted by anyone within the SSWCJ or from the social work profession.

19

UWT attempted to pair Marshall with an African-American teaching mentor, who had won the UWT distinguished teaching award, but this arrangement did not work out for Marshall.

The faculty noted Marshall's strong record in research and publication, but noted that her peers in the SSWCJ had comparable or greater productivity records without being able to spend 75 percent of their time on research. The faculty concluded that there was no doubt that Marshall would continue to be a productive scholar. But the faculty doubted that Marshall would be able to effectively teach graduate courses. In addition, the report stated,

> Faculty expressed concern regarding Dr. Marshall's patterns of behavior toward colleagues. While faculty acknowledge the racialized and gendered context of the SSWCJ and the campus in general, Dr. Marshall's lack of engagement was noted upon her arrival on campus. Additionally, there is a pattern of disrespect toward others as evidenced by lack of participation and contributions to the work of the School. Faculty believe that members of the School community have tried hard to establish positive relationships with Dr. Marshall, but her negative responses have resulted in ongoing strained interactions.

CP at 2903.

The report concluded, "In making their recommendation, faculty are clear that Dr. Marshall does not meet the minimal criteria for promotion and tenure related to teaching. While her research productivity is quite strong, is it excellent enough to outweigh the difficulties related to teaching? The faculty think not." CP at 2903.

*Acting Dean Lazzari Recommendation*

Next was the personal recommendation from Acting Dean Lazzari, which she presented in a detailed report dated November 20, 2020. Lazzari recommended that Marshall be denied tenure and promotion.

Lazzari's report favorably discussed Marshall's research and scholarship. She stated that one of the external reviewers commented on Marshall's success in obtaining funding for her research, "which they linked to the acknowledgment of the significance of her research." CP at

2895. Another external reviewer stated that Marshall's work was " 'significant in scope, complexity, and practical experience.' " CP at 2895. Lazzari concluded, "It is apparent to me that Dr. Marshall's research efforts have a strong social justice focus and, therefore, support the values of the campus and of our School." CP at 2895-96.

Regarding teaching, Lazzari recounted Marshall's low evaluation scores, and negative student comments. While Lazzari acknowledged that student evaluations can be negatively affected by bias, in her opinion the low scores could not be totally attributed to bias. She also noted the positive peer evaluations, but thought it was unusual that none of the evaluators were from the SSWCJ. Lazzari stated that Marshall's "challenges at the graduate level raise serious questions about her teaching competence and effectiveness." CP at 2897. Lazzari concluded that Marshall did not meet UWT's requirements for effective teaching. She stated,

> I definitely think there is a place in the academy for Dr. Marshall, a setting where conducting research is the primary goal. This is not the case at the University of Washington Tacoma, SSWCJ. Our primary focus is upon excellent teachers and instruction while placing a high value on research productivity as well.

CP at 2899.

Lazzari also commented that there was a lack of trust between Marshall and others at UWT. She noted that "Marshall's interactions with faculty and staff colleagues in the SSWCJ are noticeably strained and in some cases, irrevocably damaged." CP at 2899.

*UWT Tenure Committee*

The tenure review process also involves a recommendation from a campus-wide appointment, promotion, and tenure (APT) committee, which consists of elected UWT faculty members. On December 1, 2020, the APT committee in a mixed vote recommended that Marshall be denied promotion and tenure. There were two affirmative votes, two negative votes, and one abstention.

The committee's report discussed Marshall's scholarship and teaching, essentially repeating information contained in previous reports. The report stated,

> The evaluation of this committee is mixed. Some believed that her research record was sound based on external reviews; others' perceived her research record as inadequate given the amount of release time Dr. Marshall was awarded. The reviews for her teaching were mixed as well with some committee members noting the lack of improvement in graduate course student evaluations given the teaching focus of the school and campus. Others on the other hand believe that while the teaching evidence regarding Dr. Marshall is insufficient to inspire an unequivocal vote of confidence, she appears to have reacted to previous recommendations regarding her teaching, shown some improvement, and shown some previous success in her classes.

CP at 2889-90.

In conclusion, the report stated, "It is difficult to evaluate the prospects of the candidate for future performance, particularly in the area of teaching and service given the limited number of data points available and the difficulty of previous interactions between her and her colleagues." CP at 2890.

*UW Seattle Dean of School of Social Work Recommendation*

On December 9, 2020, Edwina Uehara, the Dean of the School of Social Work at UW Seattle, wrote a short letter to UW Provost Mark Richards regarding Marshall's tenure and promotion. Uehara noted the strength of Marshall's research but agreed that her teaching record was weak. Uehara concluded, "Given SSWCJ's criterion for promotion with respect to teaching, I concur that Dr. Marshall should not be promoted to the rank of Associate Professor with tenure." CP at 2915.

*Initial Recommendation and Marshall Response*

In January 2021, Vice Chancellor Purdy sent a memo to Marshall regarding her and Chancellor Pagano's initial recommendation to deny promotion and tenure and summarizing the reasons for the recommendation. The concluding paragraph stated,

Dr. Marshall has expressed concern that she is being evaluated unfairly based on her race. We have reviewed the record carefully in light of Dr. Marshall's concerns, and see no indication of racial bias or discrimination. Her qualifications have been evaluated by many different people with different backgrounds, and similar concerns regarding her teaching have emerged. Our recommendation is not based on race.

CP at 2876.

Marshall submitted a lengthy response to Purdy's and Pagano's recommendation to deny promotion and tenure. In the introduction, she stated,

It is my opinion that this and all previous reviews were conducted with bias and outside the requirements of the Faculty Code. This decision consistently misrepresents my promotion and tenure (P&T) file as it includes many inaccuracies and misquotes the faculty code ultimately resulting in a discriminatory outcome.

CP at 2877.

Regarding teaching, Marshall emphasized that the faculty code does not distinguish between teaching at the undergraduate and graduate levels. Without that distinction, she pointed out that her evaluation scores reflected an upward trajectory after her 1.3 rating in 2018, culminating in a 4.1 rating when teaching an undergraduate class in the Fall of 2019. And she noted that she received a 4.3 rating when teaching an undergraduate class in the Fall of 2020, after her tenure application was submitted.

Marshall addressed the concern that her peer evaluations were done by professors outside the SSWCJ. She noted that neither the faculty code nor SSWCJ procedures required that teaching evaluations be conducted by a professor in her discipline. In addition, her peer evaluators were trained to teach students how to teach. And she stated,

As you know, going outside the SSWCJ faculty is necessary here because of systemic race discrimination within the SSWCJ faculty. These subjective comments reinforce the unfairness of the faculty's subjective approach. . . . Thus, in the hostile and pernicious work environment in my unit, it is unclear to me why you insist that only the White American faculty in my unit, who know that I

23

reported Diane Young to UCIRO for discrimination, are the individuals whose voices matter to you.

CP at 2879.

Marshall emphasized that she had a "growing national reputation for my published and peer reviewed work in my area of research" and could bring that expertise to the classroom regarding current issues within social work. CP at 2879.

Finally, Marshall highlighted the significant efforts she had made to improve her courses and her teaching. Her improvement in teaching was reflected by the upward trajectory in teaching evaluation scores.

Marshall also provided a detailed discussion of her research and scholarship record. She quoted section 24-32 of the faculty code, which states that contributions in scholarship and research that address diversity and equal opportunity must be considered among the qualifications for promotion. Marshall stated,

> I am the only faculty member in the School of Social Work and Criminal Justice and one of few in the country addressing a unique and innovative area of social work focused on older African Americans, financial stress and health. This work is consistent with the stated mission and values of UW Tacoma's commitment to diversity, equity and inclusion. My research continues to be on the foreground of social justice in written and in verbal form.

CP at 2880.

Marshall outlined all her accomplishments in the area of scholarship, including the K01 award, other awards and honors, and producing 20 peer-reviewed publications. She pointed out that her reappointment committee described her research as outstanding and the tenure review committee praised her work. She concluded,

> Being awarded a Career Development Award (K01), a supplemental grant and the NIH loan repayment, demonstrates a proven track record of securing major National Institutes of Health (NIH) grant funding. To date I have secured over $1 million dollars in grant funding through the NIH. Therefore, with the many firsts I

24

have achieved on the UW Tacoma campus, my publication record, and with statements such as these, it is unclear to me why I would not be viewed as outstanding based on section 24-34A1-2 of the faculty code.

CP at 2881.

Marshall also highlighted her service contributions, which were extensive despite the limitations required by her K01 award. CP 2881-82.

In summary, Marshall stated,

The initial recommendation provided by the [Vice Chancellor] and the Chancellor fit within many discriminatory frameworks in which the minority applicant is always found wanting no matter the level of achievement. The justification for denying me tenure is insufficient to overcome the fact that the decision is based on racial bias and not on the actual requirements outlined under Section 34-32(A)-(F).
. . . .
Instead of being appreciated and rewarded for the scholarship that I have brought to SWCJ, I have experienced explicit and implicit racial bias and retaliation for opposing these harmful acts. The arguments I have offered above are only some of the ways in which the SWCJ faculty showed bias.
. . . .
The University of Washington leadership has failed to treat me fairly at work because of racial animus and bias embedded in White American faculty and administrators at UW-Tacoma. I have experienced racial discrimination and your letter is another example of a reprisal for opposing discrimination.

CP at 2882-83.

*Vice Chancellor Purdy/Chancellor Pagano Recommendation*

On February 1, 2021, Vice Chancellor Purdy sent a memo to UW Provost Mark Richards in which she did not recommend Marshall's promotion and tenure. Chancellor Pagano concurred with this recommendation.

Purdy summarized the votes of the tenure review committee, voting faculty, and APT committee regarding Marshall's promotion and tenure. She also noted that both the UWT SSWCJ Dean and the UW Seattle Dean of the School of Social Work were not in favor of promotion and tenure.

25

Regarding teaching, Purdy noted that Marshall received overall positive scores in the two undergraduate level classes she taught but had very low ratings in her three graduate level classes. Purdy stated, "While factors such as race and gender can negatively impact quantitative student evaluations, we have not found nor does the file cite any resource that suggests bias alone could account for such low scores." CP at 2870. Purdy also referenced the negative student comments. She acknowledged Marshall's positive peer evaluations, but emphasized that none of those evaluations were done by social work colleagues who could address aspects of teaching related to the subject matter. Purdy concluded that Marshall had not shown substantial success in teaching as required in the faculty code for promotion and tenure.

Regarding research, Purdy noted the favorable reports from external reviewers and the other committees regarding Marshall's scholarship. However, she stated,

> After careful consideration, we do not find this to be an 'unusual case' in which an outstanding record in either teaching or research may be considered sufficient for promotion, as per [the faculty code]. The campus mission and the goals of the school require tenured faculty to contribute in both teaching and research.

CP at 2872.

In conclusion, Purdy cited Executive Order 45, which states that the ability to teach effectively is an essential qualification for granting tenure or promotion. She stated, "Assessments of Dr. Marshall's scholarly record are positive, but scholarly achievement alone is insufficient to meet the needs of the school." CP at 2873.

*Provost Richards Decision*

In a letter to Chancellor Pagano dated May 10, Provost Richards concurred with Pagano's recommendation that Marshall be denied promotion and tenure after a careful review of the promotion record and Marshall's performance and qualifications. He emphasized that the faculty code required a record of substantial success in both teaching and research except in

26

unusual cases. Provost Richards concluded, "Based on my review, there is not sufficient evidence to accept the candidate's suggestion that her record of research and scholarship is unusual and should be enough for promotion and tenure." CP at 2865.

Richards expressly addressed Marshall's allegations of discrimination:

My review and decision took into consideration concerns raised by the candidate throughout the review process regarding racial bias, systemic race discrimination, and retaliation. I was not presented with evidence to support the contentions that the review process and recommendation was unfair, discriminatory, or factually unsubstantiated. The recommendation to deny was a performance based assessment focused on deficiencies in the teaching record.

CP at 2865.

Provost Richards instructed Chancellor Pagano to inform Marshall of the decision to deny her promotion and tenure, and to inform her that her appointment at UWT would cease in June 2022.

*UWT Summary Judgment Motion*

In September 2021, UWT filed a summary judgment motion seeking dismissal of all of Marshall's claims. UWT argued that there was no evidence that race had anything to do with Marshall's nonmeritorious performance reviews or her failure to receive tenure. Instead, UWT focused on the fact that Marshall's teaching record was inadequate to warrant tenure. UWT relied on the poor student evaluations and the rigorous tenure review process that determined that Marshall should not be given tenure. UWT also argued that no evidence supported Marshall's retaliation and hostile work environment claims.

UWT submitted declarations from Young, Vice Chancellor Purdy, and Chancellor Pagano discussing Marshall's reappointment and tenure process. They all stated that Marshall's race was not a factor in any decisions they made. Young stated, "I did not treat Dr. Marshall less favorably than any other employee based on her race." CP at 3171.

*Marshall Summary Judgment Response*

Marshall opposed the summary judgment motion, and filed voluminous materials and declarations to support her position. She submitted a declaration attaching her 2019 tort claim, interrogatory answers and supplemental answers, a narrative discussing events during her time at UWT that caused her emotional harm, and other documents. She also submitted witness declarations from Lavitt (two declarations), Kalikoff, and Aguirre. Marshall submitted expert declarations from Chris Knaus, and Leah Hollis. She submitted the declaration of Kimi Ginn, who helped author a report evaluating the condition of UWT faculty of color during the 2016-17 academic year. And Marshall submitted the declaration of Sarah Hampson, a professor who was up for tenure the year before Marshall.

Marshall's tort claim, interrogatory answers and emotional harm narrative all identify multiple instances that Marshall believed reflected discrimination, harassment, and retaliation. Some of the instances relate to the factual background recited above, such as conflict regarding administration of her K01 award.

Marshall's dozens of other allegations of harassment in these materials included the following:

● Young verbally assaulted Marshall about decisions she made.

● In March 2016, Young asked Marshall if she felt that she was a good fit for UWT and said that she wondered about fit, which made Marshall wonder if her job was at stake.

● Marshall expressed no desire to teach classes like Cultural Diversity because she had no expertise in that area, but Young assigned the class to her anyway because she was Black. When Harris (the only other Black professor) first arrived she also was assigned to teach the course.

● Marshall's student loan repayments, qualified for a two-year certification regarding student loan repayments. But Young decided to call the loan repayment program help desk and only certified Marshall for one year. Marshall felt that Young was behaving in a punitive and retaliatory manor and told Chancellor Pagano about Young's decision. Chancellor Pagano overturned Young's decision and approved the certification for two years.

● Young would talk about Marshall as if she were not in the room; faculty stopped speaking to her at faculty meetings; Young would move seats if Marshall sat next to her; Marshall was never invited to lunch or coffee with colleagues and felt isolated; Marshall was ignored when she spoke up and her contributions were not taken seriously.

● After Marshall's reappointment review in 2017, Marshall never felt safe at work and felt that Young and the other faculty were colluding to fire her.

● Marshall asserted that none of the faculty observed her teach but labeled her a bad teacher and tried to convince her she was a poor teacher.

● Purdy repeatedly told Marshall that she was not a good teacher, she could not teach, and that the faculty did not want her there.

● Purdy told Marshall that if she decided to stay at UWT that she would never get tenure because the faculty did not like her.

● During one meeting with Purdy and Young, Young described Marshall as "struggling" with her teaching, and Marshall corrected her because she herself never said she was struggling.

● Marshall experienced no stress, fear, embarrassment, humiliation, anxiety or anguish when Young was on sabbatical.

● Both Pagano and Purdy attempted to convince Marshall she was not a good fit for UWT, and they questioned Marshall about whether she had heard anything back about a position with the Veterans Administration and the School of Social Work at UW Seattle.

● Marshall was given a teaching mentor, Carolyn West, but instead of helping with Marshall's teaching, West gave her advice on how to make herself marketable, how to develop a personal website, and to send a curriculum vitae to ensure Marshall was ready for the job market.

● SSWCJ professor Rich Furman accused Marshall of being angry and aggressive (a very stereotypical way of describing Black men and women), and he never was nice to her.

Lavitt was the Vice Chancellor of UWT in 2016-17 and then was a colleague of Marshall's in the SSWCJ from 2017 until she left UWT in June 2019. She stated that in 2016 Young was complaining about Marshall and painted a picture of Marshall being difficult. In July 2017, Young wanted Lavitt to be aware that Marshall was not supporting the SSWCJ program. Lavitt described SSWCJ faculty meetings as "chilly" and stated that there was little support for Marshall. Even Emlet, her assigned mentor, did not appear to like her. In June 2016, a departing faculty member discussed with Lavitt how badly Marshall was being treated.

Lavitt described a SSWCJ faculty retreat in the Fall of 2018 where Vice Chancellor Purdy asked Marshall to leave the meeting so they could discuss reappointment policies and practices. Lavitt stated, "It was Dr. Purdy's advice that the faculty create policies with criteria to assess 'collegiality.' She talked about the necessity of ensuring a 'good fit' for the department." CP at 3520. Lavitt continued, "Based on my 20 years of academic administrative experience, 'fit' is often code for policies that perpetuate bias and reduce the likelihood of having diverse faculty." CP at 3520.

Lavitt was so upset by Purdy's remarks about collegiality and fit that she emailed a colleague in another program. The email stated, "I am concerned about a recent message from [Purdy] regarding [promotion and tenure]. She talked to Social Work about faculty 'fit' and the need to develop criteria for collegiality. . . . . I am concerned about the impact of these messages on the success of faculty of color in particular." CP at 3528. Lavitt also stated that in one discussion about hiring more persons of color, Chancellor Pagano stated,

" '[W]hy can't we find a good one?' " CP at 3524. Lavitt understood this statement as referring to a good person of color.

Kalikoff is the Director of the Center for Teaching and Learning at UW Seattle, and also an associate professor emeritus at UWT. The Center's focus is on evidence-based teaching, which uses strategies to increase student engagement and achievement in contrast to nonstop lectures. Kalikoff addressed her evaluations of Marshall's classes in February 2018 and January 2019, discussed above. After her 2018 observation of Marshall's class, Kalikoff believed that Marshall had an obvious commitment to evidence-based teaching and that her class was one of the best-organized classes she had ever seen.

Kalikoff noted that Young in 2018, the tenure review committee, and Purdy in 2021 all discounted peer reviews coming from outside the SSWCJ. But Kalikoff explained that these comments ignored the fact that the criticisms of Marshall's teaching related to her delivery, not deficiencies in the subject matter.

Regarding the student evaluations, Kalikoff stated, "Student feedback has value to the evaluation of teaching, but only when interpreted in the context of peer review and faculty self-assessment." CP at 3424. She said that although student voices are important, student evaluations cannot be used to assess an instructor's performance. Kalikoff also noted that

31

research suggests that implicit bias may be an issue when students perceive that a faculty member is young and a person of color. She said, "Don't hold the instructor responsible for implicit bias." CP at 3427. According to Kalikoff, research of student evaluations has shown that Black faculty and particularly women of color "often receive lower student ratings and harsher student comments than other instructors." CP at 3428.

Aguirre is a full professor of education at UWT. Her declaration attached the letter she wrote about her observation of Marshall's class in March 2017, discussed above.

Knaus also is a professor in education at UWT, specializing in identifying structural racism in educational systems. He pointed out that UWT had around 360 full time faculty, but only two of them were Black. Knaus explained that reliance on student evaluations is a racialized barrier to the advancement of people of color through the tenure process and that research shows student evaluations are racially biased against Black women. Peer review for tenure also exhibits implicit bias and enforces White faculty scholarly approaches.

Knaus stated that barriers to faculty advancement often are justified by "coded language." CP at 3329. He stated, "Coded language includes statements about collegiality and fit; these are usually applied within a context of questioning whether a potential hire or candidate for tenure/promotion is a good 'fit' within a department, college, or university." CP at 3329.

Knaus discussed racial discrimination at UWT, stating that "I personally have witnessed too many incidents of racial discrimination at the UW Tacoma campus to recall of them." CP at 3331. He attached a January 2016 Diversity Fellows Statement that he was involved in drafting, that documented racism that impacted faculty of color. The report's executive summary stated,

> People of color employed by the University of Washington Tacoma face (1) barriers well-documented in higher education literature and in reports previously convened by the University of Washington; (2) the passive aggressiveness of local culture in UWT and in the Pacific Northwest; (3) seemingly permanent inertia

manifested by colleagues and leadership who ignore thoughtful research reports (like this one) of campus diversity issues and/or who take little action to address their personal and professional concerns; and (4) a context of faculty and university policies that do not fundamentally address the causes, nor practice of, racial exclusion and oppression.

CP at 3336.

Hollis's declaration attached a lengthy expert witness report. Hollis has a doctorate in administration, training and policy, and for 20 years has researched "institutional abuse, racism, sexism, and other structural obstacles in higher education." CP at 3396. She discussed workplace bullying in higher education, and stated that people of color are most likely to be bullied and that Black women are more likely to face multiple bullies.

Hollis provided a discussion of some of the events during Marshall's time at UWT that Hollis perceived as improper or unfair. She concluded, "Despite Dr. Marshall being an ascending academic star, the record shows that Dr. Young has engaged in a campaign of workplace bullying since Dr. Marshall's point of hire." CP at 3398. Hollis suggested that the only reason that Marshall was hired was so UWT could access her grant money, a type of tokenism.

Hollis stated her opinion that the student evaluation process is flawed. She cited research stating that students consistently rate Black faculty the lowest among all other faculty. Hollis stated that several universities across the country are "looking for alternatives to this flawed student evaluation process rather than rest the career of a professor on a group of late teenagers." CP at 3409.

Ginn attached a draft report that she helped draft on behalf of the UWT Office of Equity and Inclusion. The purpose of the report was to document the experiences of UWT faculty of

color "regarding how well they fit and how well received they feel at [UWT]". CP at 3367. The report was based on structured interviews with 24 UWT faculty of color.

As a whole, the report found that the faculty interviewed experienced a hostile racial climate. The report identified four themes where faculty ran into issues related to their race. One of highest reported issues was between the faculty of color and their director or dean. It was reported that directors used racist and sexist language in their evaluations and did not support their professional trajectories. Directors often sided with students rather than the faculty of color when issues arose in the classroom. And as a result of these interactions, faculty of color often spent time negotiating problems or documenting racist interactions rather than developing their professional careers.

Another problem area identified by the report was within the tenure process. Faculty of color were expected to publish more than their White peers and their work was often perceived as questionable.

Sarah Hampson stated in her declaration that she was up for tenure in another department the year before Marshall applied for tenure. Hampson learned that Vice Chancellor Purdy was enforcing a 2018 faculty code change stating that the tenure review committee had to be comprised of faculty within her unit. When Hampson expressed a concern to Purdy, Purdy assured her that her committee was okay because it already had been constituted and she knew the change was in error. Marshall later told Hampson that she was not permitted to have faculty from other units on her tenure review committee.

*Trial Court Ruling and Appeal*

The trial court granted summary judgment in favor of UWT and dismissed all of Marshall's claims. Marshall filed a motion for reconsideration, which the court denied.

After summary judgment was granted, Marshall's attorney submitted a declaration attaching a letter from Young relating to the 2019 reappointment of a White professor that previously had been sealed. The reappointment review committee, the voting faculty, and Young all recommended that the White professor be reappointed even though she struggled with teaching, significant improvement was needed in her scholarly productivity, and she needed to increase her service contributions. However, this declaration was not included in the pleadings the trial court considered on summary judgment.

Marshall appeals the trial court's grant of summary judgment in favor of UWT.

ANALYSIS

A.    SUMMARY JUDGMENT STANDARD

We review summary judgment orders de novo. *Mihaila v. Troth*, 21 Wn. App. 2d 227, 231, 505 P.3d 163 (2022). We view all evidence in the light most favorable to the nonmoving party, including reasonable inferences from the evidence. *Id.* Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id.* A genuine issue of material fact exists if reasonable minds can come to different conclusions on a factual issue. *Id.*

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Sartin v. Est. of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020). A moving defendant can meet this burden by demonstrating that the plaintiff cannot support their claim with any competent evidence. *Id.* If the defendant makes such a showing, the burden shifts to the plaintiff to present evidence that creates a genuine issue of material fact. *Id*. "Summary judgment is appropriate if a plaintiff fails to show sufficient evidence that creates a

question of fact about an essential element on which he or she will have the burden of proof at trial." *Id.*

B.    RACIAL DISCRIMINATION CLAIM

Marshall argues that the trial court erred in granting summary judgment in favor of UWT on her discrimination claim because she produced sufficient evidence to create a genuine issue of fact regarding that claim.  We agree.

1.    Legal Principles

The Washington Law Against Discrimination (WLAD), chapter 49.60 RCW, prohibits employers from discharging or discriminating against any employee based on one of several protected characteristics, including race and gender.  RCW 49.60.180(2), (3).

A person can show direct evidence of discrimination by demonstrating that "(1) the defendant employer acted with a discriminatory motive and (2) the discriminatory motivation was a significant or substantial factor in an employment decision." *Alonso v. Qwest Commc'ns Co.*, 178 Wn. App. 734, 744, 315 P.3d 610 (2013).

Because direct evidence of racial discriminatory intent is rare, a person " 'may rely on circumstantial, indirect, and inferential evidence to establish discriminatory action.' " *Mackey v. Home Depot USA, Inc.*, 12 Wn. App. 2d 557, 571, 459 P.3d 371 (2020) (quoting *Mikkelsen v. Pub. Util. Dist. No. 1 of Kittitas County*, 189 Wn.2d 516, 526, 404 P.3d 464 (2017)).  To analyze circumstantial evidence in this context, we apply the burden-shifting framework adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Mackey*, 12 Wn. App. 2d at 571.

First, the plaintiff must establish a prima facie case of discrimination. *Id.*  This requires a showing that the plaintiff was (1) a member of a protected class, (2) terminated or suffered an

adverse employment action, and (3) performing satisfactory work. *Id.* A rebuttable presumption of discrimination exists if the employee establishes a prima facie case. *Id.*

Second, the burden then shifts to the employer to demonstrate a legitimate, nondiscriminatory reason for the employment action. *Id.* "The employer is not required to persuade the court that it actually was motivated by the nondiscriminatory reason, only that the employer's evidence if taken as true would permit the conclusion that there was a nondiscriminatory reason." *Id.* at 571-72.

Third, if the employer satisfies this burden, the plaintiff must present evidence that the alleged nondiscriminatory reason was a pretext. *Id.* at 572. The plaintiff may satisfy this prong by presenting evidence that the employer's reason is a pretext or that discrimination was a substantial factor motivating the employment action even if the stated reason is legitimate. *Id.* "The employee is not required to show that discrimination was the only motivating factor for the discharge because an employer's decision may be based on both legitimate and illegitimate reasons." *Id.*

The Supreme Court has emphasized that under this framework, courts should be hesitant to grant summary judgment in employment discrimination cases: "Summary judgment for an employer is seldom appropriate in employment discrimination cases because of the difficulty of proving discriminatory motivation." *Mikkelsen*, 189 Wn.2d at 527; *see also Scrivener v. Clark Coll.*, 181 Wn.2d 439, 445, 344 P.3d 541 (2014). When there are reasonable competing inferences of both discrimination and nondiscrimination, the employer's true motivation is a question of fact. *Mikkelsen*, 189 Wn.2d at 528. "To overcome summary judgment, the plaintiff needs to show only that a reasonable jury could find that discrimination was a substantial factor

in the employer's adverse employment action." *Id.* And the plaintiff's burden is only one of production, not of persuasion. *Scrivener*, 181 Wn.2d at 445.

### 2. Inference of Nondiscrimination

Initially, UWT argues that it is entitled to an inference of nondiscrimination because the same decision-makers who hired Marshall also took the employment actions at issue. We disagree.

UWT relies primarily on *Hill v. BCTI Income Fund-I*, 144 Wn.2d 172, 23 P.3d 440 (2001). The court in *Hill* stated, "When someone is both hired and fired by the same decision makers within a relatively short period of time, there is a strong inference that he or she was not discharged because of any attribute the decision makers were aware of at the time of hiring." 144 Wn.2d at 189. In this situation, the employee must answer the question: "if the employer is opposed to employing persons with a certain attribute, why would the employer have hired such a person in the first place?" *Id.*

However, the people that hired Marshall were not the only ones involved in the adverse employment actions. UWT points to Young, who lobbied for authorization to hire Marshall. But she was not the only person involved in the reappointment and merit review processes and she was not involved in the tenure review process. UWT also points to Professor Casey, who chaired Marshall's hiring search committee, and Professor Emlet, who was on the committee. But those professors were not the sole decision makers regarding the employment actions at issue. We conclude that UWT is not entitled to an inference of nondiscrimination.

### 3. Direct Evidence Analysis

Marshall argues that she produced direct evidence of a discriminatory motive based on her race. We disagree.

Marshall relies solely on statements she attributes to Purdy, Pagano, and Young as direct evidence of discrimination. "We generally consider an employer's discriminatory remarks to be direct evidence of discrimination." *Alonso*, 178 Wn. App. at 744.

In *Alonso*, the plaintiff was a disabled combat veteran who claimed discrimination based on his protected status as a veteran, a Mexican-American, and a disabled person. *Id.* at 744-45. He presented evidence that his supervisor (1) stated that he hated " 'people that served in the first Gulf War for five days and claim a disability,' " (2) stated that he hated disabled combat veterans and hated the fact that the plaintiff was receiving disability benefits, (3) referred to Mexicans as " 'Spics' " and allowed other people to use the term, and (4) openly mocked the plaintiff's speech impediment and accent. *Id.* The court held that this direct evidence was sufficient to prove that the supervisor acted with discriminatory motive. *Id.*

First, Marshall relies on Purdy's comments in the October 2018 faculty meeting about creating policies with criteria to assess collegiality and the need for ensuring a good fit with the department. Similarly, Marshall notes that Young talked to her about her fit in the department in her 2016 review. Marshall emphasizes that Lavitt testified that "collegiality" and "fit" are code words for policies that perpetuate bias, as did Knaus.

Marshall claims that this coded language is direct evidence of discriminatory motive. But by its plain meaning, coded language has a hidden meaning. The use of words like "collegiality" and "fit" are not explicitly discriminatory terms. Even if we can infer that these statements reflected an intent to exclude persons of color from advancement, the evidence is indirect rather than direct.

Second, Marshall refers to Chancellor Pagano's statement that "why can't we find a good one," which Lavitt understood as referring to a person of color. CP at 3524. Marshall claims

39

that this statement shows that Chancellor Pagano was poorly equipped to confront race discrimination. To the extent we can infer that this statement reflected tokenism, once again the evidence is indirect rather than direct.

Third, Marshall refers to Emlet's statement after her first reappointment that she was aloof and unengaged, which she characterizes as a common bias perception. But again, these are not explicitly discriminatory terms. This evidence also is indirect rather than direct.

Unlike in *Alonso* where the employer used overtly racist and discriminatory language to disparage Alonso, there is no evidence that anyone associated with UWT made overtly discriminatory or racist remarks about Marshall or persons of color in general. And Marshall points to no other direct evidence of discrimination against her.[3] Therefore, we conclude that Marshall did not present direct evidence of discriminatory intent.

4. Circumstantial Evidence Analysis

Alternatively, Marshall argues that she produced enough circumstantial evidence of discrimination to defeat summary judgment regarding her racial discrimination claims. We agree.

a. Prima Facie Case

There is no question that Marshall is a member of a protected class and suffered adverse employment actions: having her reappointment deferred and receiving a nonmeritorious finding in 2016-2017, receiving a nonmeritorious finding in 2017-2018, and being denied promotion and tenure in 2021. However, to establish a prima facie case Marshall also must show that she was performing satisfactory work. *Mackey*, 12 Wn. App. 2d at 571. UWT challenges this element.

---

[3] We do not foreclose the possibility that "coded" statements can be so numerous and pervasive that they could constitute direct evidence of discriminatory intent. But that is not the evidence here.

UWT emphasizes the poor student evaluation scores and negative student comments regarding the three graduate classes Marshall taught. According to UWT, the poor teaching evaluations justified all the employment actions, including her denial of promotion and tenure. UWT claims that in this context, her work was not satisfactory.

Regarding 2017 reappointment, Marshall at that time had taught one undergraduate class with positive evaluations and one graduate class with lower evaluation scores – a median score of 2.8 and an adjusted combined median score of 3.3 out of 5. But she had excellent research and scholarship. And the reappointment review committee recommended reappointment, stating, "The review committee feels that there is every reason to believe that Dr. Marshall will continue to be a productive scholar, continue her excellent teaching at the undergraduate level as reflected in her teaching evaluation and improve her teaching at the graduate level." CP at 3042. A reasonable person could determine, as did the committee, that Marshall should have received reappointment in 2017. Therefore, we conclude that there is at least a question of fact as to whether Marshall's work was "satisfactory" enough to establish a prima facie case regarding this decision.

Regarding the nonmeritorious findings in 2016-17 and 2017-18, Marshall received lower evaluation scores in her 2017 class and very low scores in her 2018 class. But the peer evaluators of those classes were very complementary. In 2017, education professor Aguirre stated that Marshall's performance in class was "an exemplary model for faculty to learn from." CP at 2995. In 2018, education professor Kalikoff stated that Marshall's class was "one of the best-organized classes I've ever seen, and I've seen a lot of well-organized classes." CP at 3001. In addition, Marshall's research and scholarship continued to be very strong. Finally, the

41

reappointment review committee recommended reappointment in 2017 and Marshall actually was reappointed in 2018.

Under these facts, a reasonable person could determine that Marshall's work was "satisfactory" enough that she should not have received nonmeritorious findings in 2016-17 and 2017-18. Therefore, we conclude that there is at least a question of fact as to whether Marshall established a prima facie case of discrimination regarding the nonmeritorious findings.

Regarding the denial of promotion and tenure, Marshall received positive scores in the two undergraduate classes she taught. All of the peer evaluations of Marshall's teaching were highly complementary. And it is undisputed that Marshall's scholarship and research were excellent. The only negative evaluations were in her three graduate classes. And after the very low evaluation scores in 2017, the scores improved for the 2018 graduate class and greatly improved for the 2019 undergraduate class. A reasonable person could determine, as did a few of the members of the APT committee, that Marshall should have received tenure. Therefore, we conclude that there is at least a question of fact as to whether Marshall's work was "satisfactory" enough to establish a prima facie case regarding this decision.

b. Legitimate Nondiscriminatory Reason

Regarding reappointment, the reason given for the voting faculty's mixed vote on Marshall's reappointment in 2017 was the significant concerns with her teaching performance. Teaching performance was a legitimate, nondiscriminatory reason for the deferral. In addition, the primary reason given by both the acting director and the Vice Chancellor for deferring was the fact that the review committee and the faculty's recommendations differed and the faculty did not support reappointment. This also was a legitimate, nondiscriminatory reason.

Regarding the nonmeritorious findings, the reasons given in both 2017 and 2018 were the poor evaluations in the graduate classes Marshall taught. The 2017 scores were somewhat low, and the 2018 scores were even lower – 1.3 out of 5. Teaching performance was a legitimate, nondiscriminatory reason for the nonmeritorious findings.

Regarding denial of promotion and tenure, UWT again had a nondiscriminatory reason for not granting Marshall promotion and tenure: poor student evaluation scores and negative student comments regarding the three graduate classes she taught. This was the stated reason given in all the recommendations and reports regarding Marshall's advancement. And there is no question that poor teaching performance is a legitimate reason for denying promotion and tenure. The faculty code expressly states that those seeking to be appointed to the rank of associate professor with tenure must demonstrate a record of substantial success in both teaching and research.

As noted above, UWT's burden is only to show that its evidence, if taken as true, showed a legitimate nondiscriminatory reason for the employment action. *Mackey*, 12 Wn. App. 2d at 571-72. We conclude that UWT met the second prong of the analysis.

      c.   Evidence of Pretext/Substantial Factor

In order to avoid summary judgment, Marshall had to present sufficient evidence to create a question of fact as to whether UWT's stated reason for deferring Marshall's reappointment and for not granting her promotion and tenure was a pretext or that discrimination was a substantial factor motivating the actions.

      i.   Legal Principles

The ways in which an employee can show pretext include that the employer's reason (1) had no factual basis, (2) was not really a motivating factor for the employment action, (3) lacked

a temporal connection with the decision, and (4) was not a motivating factor for employment actions for similarly situated employees. *Mackey*, 12 Wn. App. 2d at 581. Significantly, whether the employer's decision was correct or incorrect is not necessarily dispositive. *Id.* at 582. The question is whether the employer's stated reason for the employment action was the *actual* reason. *Id.*

Even if the plaintiff cannot show that the employer's reason was pretextual, the plaintiff still can satisfy the third prong by showing that discrimination was a substantial motivating factor for the employment decision. *Id.* at 583.

As noted above, our analysis must be guided by the Supreme Court's admonition that summary judgment is rarely appropriate in employment discrimination cases. *Mikkelsen*, 189 Wn.2d at 527. This is because a plaintiff often does not have direct evidence of discriminatory motive. Therefore, we must reverse a summary judgment order if we determine that there are reasonable competing inferences of both discrimination and nondiscrimination. *Id.* at 528.

ii.   Analysis

Marshall's argument essentially is that UWT made the wrong decisions regarding her reappointment, nonmeritorious findings, and promotion and tenure. She seems to suggest that if a reasonable person could conclude that these decisions were wrong, this fact alone creates a question of fact regarding race discrimination. However, the fact that UWT may have made the wrong decision is not necessarily dispositive. *Mackey*, 12 Wn. App. 2d at 582. Even if the decision was "wrong," Marshall must present evidence that the employer's alleged nondiscriminatory basis for the decision was not the *actual* reason. *See id.* There must be something more than an incorrect employment action for there to be a reasonable inference of race discrimination.

Here, viewing the evidence in the light most favorable to Marshall, there is "something more." We conclude that based on the totality of the evidence viewed in the light most favorable to Marshall, Marshall has presented sufficient evidence for a jury to reasonably infer that UWT's stated reason for its employment actions – poor graduate student evaluations – was a pretext or that the actions were motivated by racial discrimination. A combination of a number of factors compels this conclusion.

First, we cannot ignore the evidence that two separate studies conducted while Marshall was at UWT documented pervasive racism against people of color employed at UWT. Standing alone, this general evidence of racism may not be sufficient to overcome summary judgment because Marshall must show that racism affected her personally. However, this evidence of institutional racism provides a part of the foundation for reviewing the employment actions involving Marshall.

Second, there is at least some evidence the people involved in the employment actions involving Marshall used language that suggests racial animus. In 2016 Young questioned Marshall about whether she was a good fit for UWT. And Chancellor Purdy discussed fit and collegiality as criteria for tenure in a faculty meeting. Lavitt submitted a declaration stating that based on her 20 years of experience, words like "fit" and "collegiality" often are code for enforcing biased policies and reduce the likelihood of hiring diverse faculty.

There also are a few examples in the record of comments that carry racial connotations. SSWCJ professor Emlet – Marshall's assigned mentor – called her aloof and questioned whether she wanted to be at UWT. This comment could be interpreted as reflecting an attitude based on a stereotype of Black women. SSWCJ professor Furman described Marshall as angry and aggressive. Describing a Black woman with words like these evokes the harmful stereotype of

45

the angry Black woman. *See Henderson v. Thompson*, 200 Wn.2d 417, 436, 518 P.3d 1011 (2022). And Chancellor Pagano stated, "[W]hy can't we find a good one," which Lavitt interpreted as referring to faculty of color. CP at 3524. This statement could be interpreted as tokenism, a type of racial discrimination.

Again, this evidence standing alone may not be sufficient to overcome summary judgment. But these comments also provide part of the foundation for reviewing the employment actions involving Marshall.

Third, UWT's adverse employment decisions regarding Marshall were based almost solely on low student evaluations in three graduate classes. UWT's emphasis on these evaluations seems somewhat unusual in light of other information that UWT acknowledged but essentially ignored. Four peer evaluations of those same graduate classes were very positive, praising Marshall's teaching ability. Marshall received favorable evaluations in the two undergraduate classes she taught. And following the very poor scores for the 2018 graduate class, Marshall showed improvement in her teaching. The evaluation scores improved the next year for her graduate class and greatly improved the year after that for her undergraduate class.

Further, UWT recognized that there could be reasons other than Marshall's teaching ability for the negative evaluations. Multiple people and committees acknowledged that student evaluations of women of color often reflect implicit racial and gender bias, which may have affected Marshall's evaluations. And Kalikoff explained in her letter to Young that Marshall may have received poor evaluations because she was using an evidence-based teaching method that did not rely on the traditional lecture format and was uncomfortable for the students. Kalikoff stated, "At the risk of stating the obvious, when students expect traditional lecture and get active learning, they may conclude that the teacher is teaching the wrong way." CP at 3420.

46

Finally, it is significant that while the SSWCJ faculty consistently criticized Marshall's teaching ability based on the student evaluations, not a single faculty member observed one of Marshall's classes to confirm or refute the evaluations. This fact is especially significant because the SSWCJ faculty noted that none of Marshall's peer reviewers taught in the field of social work and weighed their evaluations less because of that fact. Nor did Purdy or Pagano observe Marshall's teaching.

A reasonable person may have difficulty understanding UWT's unwavering reliance on low evaluation scores for three classes in light of all the other evidence that either contradicted or explained those low scores and in the absence of any personal knowledge regarding Marshall's teaching ability. A reasonable inference is that something other than poor teaching was the real reason for the adverse employment actions.

Fourth, Marshall's very strong research and scholarship is a factor that must be considered. Marshall's K01 award was very prestigious and brought $1 million into the university. This award required Marshall to focus on research rather than teaching. And almost every person and committee that evaluated Marshall noted that she clearly met expectations regarding research and scholarship. In addition, Marshall appeared to be a rising star in her field because of her scholarship. Marshall's tenure review committee stated that Marshall had a "*growing national reputation* in the areas of social work, gerontology, public health and economics." CP at 2918 (emphasis added).

Reasonable persons could disagree as to whether Marshall should have been granted tenure based on her research and scholarship alone, as allowed by the UW faculty code. But what seems unusual is that UWT made almost no effort to figure out a way to retain this "rising star" on the faculty. No SSWCJ faculty observed Marshall's classes with a goal of helping her

improve as a teacher. UWT did not attempt to figure out an accommodation, such as having Marshall teach only undergraduate classes until her teaching improved. And in the five years Marshall taught at UWT, there was almost no effort to clarify Marshall's expectations or create policies around her workload in connection with her K01 award requirements so the various committees could appropriately evaluate her.

In summary, the evidence raises too many questions surrounding the employment actions regarding Marshall for us to hold as a matter of law that Marshall has not presented sufficient evidence that UWT's stated reasons were a pretext or that racial discrimination was a substantial factor in its actions. Why did UWT rely so heavily on the poor evaluation scores and negative comments from a small number of graduate students? Why was more weight not given to Marshall's positive peer evaluations? Why were the positive reviews in Marshall's undergraduate classes not seriously considered along with her graduate classes? Why did Marshall's very strong research and scholarship record not factor more prominently in the employment decisions? Why did the SSWCJ faculty make almost no effort to retain someone who was developing national prominence in her field? A jury must be allowed to determine if the answers to these questions relate to race discrimination.

To be sure, UWT has viable arguments that basing the employment actions regarding Marshall was not a pretext and that racial discrimination was not a substantial factor in those actions. For example, UWT emphasizes that the promotion and tenure process involved multiple layers of review, including by people outside the SSWCJ, and 18 out of 20 faculty members and administrators concluded that her teaching record was insufficient to warrant tenure. UWT points out that although Marshall focuses on her peer evaluations, undergraduate classes and scholarship record, the tenure reviewers considered all this information in making their

recommendations. However, these are arguments that must be considered by a jury, not arguments that require dismissal of Marshall's claims as a matter of law.

The Supreme Court has clearly stated that summary judgment is rarely appropriate in employment discrimination cases. *Mikkelsen*, 189 Wn.2d at 527. Accordingly, we hold that the trial court erred in granting summary judgment in favor of UWT on Marshall's race discrimination claim.

C.     HOSTILE WORK ENVIRONMENT CLAIM

Marshall argues that trial court erred in granting summary judgment in favor of UWT on her hostile work environment claim. We agree.

1.     Legal Principles

One type of discrimination that violates the WLAD is the creation of a hostile work environment. *See LaRose v. King County*, 8 Wn. App. 2d 90, 104, 437 P.3d 701 (2019). To establish a prima facie claim of a hostile work environment, the plaintiff must show that " '(1) the harassment was unwelcome, (2) the harassment was because of [their protected class], (3) the harassment affected the terms and conditions of employment, and (4) the harassment is imputable to the employer.' " *Id.* at 105 (quoting *Antonius v. King County*, 153 Wn.2d 256, 261, 103 P.3d 729 (2004)).

Regarding the third element, the totality of the circumstances must show that the harassment was " 'sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment.' " *Antonius*, 153 Wn.2d at 261 (quoting *Glasgow v. Georgia-Pacific Corp.*, 103 Wn.2d 401, 406-07, 693 P.2d 708 (1985)). There must be a "pervasive pattern of unlawful treatment over a period of time." *Antonius*, 153 Wn.2d at 268. In analyzing this element, we consider "the frequency and severity of the discriminatory conduct, whether the

conduct is physically threatening or humiliating or a mere offensive utterance, and whether the conduct unreasonably interferes with an employee's work performance." *LaRose*, 8 Wn. App. 2d at 111-12. Whether harassment affects the plaintiff's conditions of employment generally is a question of fact. *Id.* at 112.

    2. Statute of Limitations

Initially, the parties dispute whether the statute of limitations prevents Marshall from relying on incidents that occurred more than three years before she filed her complaint against UWT on September 30, 2019.

A claim of discrimination under the WLAD is subject to the general three-year statute of limitations stated in RCW 4.16.080(2) for personal injury actions. *Antonius*, 153 Wn.2d at 261-62. However, courts can consider acts that extend beyond the statute of limitations if they are " 'part of the same actionable hostile work environment practice.' " *Id.* at 271 (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)). To constitute part of the same practice, the acts must have "some relationship to each other." *Antonius*, 153 Wn.2d at 271. But if there is no relationship between the actions or there is an intervening act by the employer, then the previous acts cannot be considered a part of one hostile work environment claim. *Id.*

Here, Marshall submitted a list of events that she believed contributed to the hostile work environment that date back to January 2015. And from the time Marshall started at UWT until September 30, 2016, there was no significant gap or intervening act to separate these acts from the others. The acts alleged before and after September 2016 all contained interactions with Young, Purdy, Pagano, or others at UWT. The events before September 30, 2016 bear some relationship to one another and therefore are part of one hostile work environment claim.

Therefore, we conclude that Marshall can rely on incidents that occurred before September 30, 2016 to support her hostile work environment claim.

3.    Hostile Work Environment Analysis

Marshall provided multiple instances of conduct that she believed was harassing beginning during the hiring process and continuing until she was denied tenure. These instances are contained in her tort claim, interrogatory answers, and emotional harm narrative. Some of the instances are listed in the statement of facts above. In addition, Hollis provided an expert opinion that Young's conduct toward Marshall constituted bullying.

For summary judgment purposes, we must accept Marshall's statements of what occurred and Hollis's opinion as true. *Mihaila*, 21 Wn. App. 2d at 231. We conclude that there are genuine issues of fact as to whether Marshall experienced unwelcome harassment that affected the terms and conditions of employment and that were imputable to UWT. The issue here is whether there is a question of fact as to whether this harassment was because of Marshall's race.

Marshall argues that UWT faculty and administrators used coded language that reflected racist attitudes, which shows that the harassment she experienced was because of her race. As discussed above, Marshall presented evidence that people involved in her employment actions used coded language that could reflect racial animus. Young questioned Marshall about whether she was a good fit for UWT. Chancellor Purdy discussed fit and collegiality as criteria for tenure in a faculty meeting. Professor Emlet – Marshall's assigned mentor – called her aloof and questioned whether she wanted to be at UWT. Professor Furman called Marshall angry and aggressive. Chancellor Pagano stated, "[W]hy can't we find a good one?" CP at 3524. These comments carry racial connotations or are common stereotypes regarding Black women.

51

These comments may not be sufficient standing alone to create a question of fact regarding whether alleged pervasive harassment that lasted over a six-year period was based on Marshall's race. But Marshall can rely on the reasonable inference that the harassment was because she was Black. Unlike for the pretext issue, UWT has not presented a legitimate nondiscriminatory reason for the harassment of Marshall. In fact, UWT offers no explanation other than Marshall's race, nondiscriminatory or otherwise, to explain the harassment. Viewed in the light most favorable to Marshall, these facts create a reasonable inference that the harassment was based on her race.

Viewing the facts in a light most favorable to Marshall, we hold that Marshall presented a genuine issue of material fact as to whether she was subjected to a hostile work environment because of her race. Accordingly, we hold that the trial court erred in granting summary judgment in favor of UWT on Marshall's hostile work environment claim.

D.    RETALIATION CLAIMS

Marshall argues that the trial court erred in granting summary judgment in favor of UWT on her whistleblower and WLAD retaliation claims because she presented sufficient evidence to create genuine issues of material fact regarding those claims. We disagree.

1.    Whistleblower Retaliation

Marshall argues that there is a question of fact as to whether UWT discriminated against her because she made a whistleblower report. We disagree.

a.    Legal Principles

The whistleblower retaliation statute, RCW 42.40.050(1)(a) provides, "Any person who is a whistleblower, as defined in RCW 42.40.020, and who has been subjected to workplace reprisal or retaliatory action is presumed to have established a cause of action for the remedies

provided under chapter 49.60 RCW." Under RCW 42.40.050(1)(b), "reprisal or retaliatory action" means but is not limited to denial of promotion, dismissal and a superior behaving in a hostile manner toward the whistleblower.

Under RCW 42.40.020(10)(a), a whistleblower is defined as an employee who reports or is perceived to have reported "alleged improper governmental action" to the state auditor's office or other public official. The term "alleged improper governmental action" includes a number of categories of conduct, including actions that constitute a waste of public resources, violate state or federal law, causes substantial and specific danger to the public health or safety, or constitutes gross mismanagement. RCW 42.40.020(6)(a). However, improper governmental action does not include

> personnel actions, for which other remedies exist, including but not limited to employee grievances, complaints, appointments, promotions, transfers, assignments, reassignments, reinstatements, restorations, reemployments, performance evaluations, reductions in pay, dismissals, suspensions, demotions, violations of the state civil service law, alleged labor agreement violations, reprimands, claims of discriminatory treatment, or any action which may be taken under chapter 41.06 RCW, or other disciplinary action except as provided in RCW 42.40.030.

RCW 42.40.020(6)(b).

Once the employee has established a presumption of whistleblower retaliation, RCW 42.40.050(2) states that the burden shifts back to the employer to rebut the presumption.

b. Analysis

Marshall filed her whistleblower report in December 2018 with the state auditor's office. She alleged that Young and UWT were improperly using an extra meritorious category not identified in the faculty code in merit reviews to award White faculty extra money. She claimed that use of this category violated the faculty code.

However, conduct that violates the faculty code does not fall within any of the definitions of "improper governmental action" under RCW 42.40.020(6)(a). Instead, Marshall's report involved performance evaluations and discriminatory treatment, both of which RCW 42.40.020(6)(b) expressly excludes from the definition of "improper governmental action." Therefore, Marshall did not meet the definition of "whistleblower" under RCW 42.40.020(10)(a) and is not able to assert a retaliation claim under RCW 42.40.050(1)(a).

We hold that the trial court did not err in granting summary judgment in favor of UWT on Marshall's whistleblower retaliation claim.

2. WLAD Retaliation

Marshall argues that there is a question of fact as to whether UWT discriminated against her because she opposed discrimination at UWT. We disagree.

a. Legal Principles

RCW 49.60.210(1) states,

It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter.

Marshall presented no direct evidence of retaliation. But the evidentiary burden-shifting framework also applies to retaliation claims. *Mackey*, 12 Wn. App. 2d at 571. To establish a prima facie case of retaliation under RCW 49.60.210(1), a plaintiff must show that (1) they engaged in statutorily protected activity, (2) their employer took an adverse employment action against the employee, and (3) there was a causal connection between the employee's activity and the adverse action. *Id.* at 574.

If the plaintiff establishes a prima facie case, then the defendant may rebut the claim by presenting evidence of a legitimate nondiscriminatory reason for the adverse action. *Id.* at 571-

54

72. This shifts the burden back to the plaintiff to prove that the employer's reason is pretextual. *Id.* at 572.

When a person reasonably believes they are opposing discriminatory practices, RCW 49.60.210(1) protects that person whether or not the practice is actually discriminatory. *Ellis v. City of Seattle,* 142 Wn.2d 450, 460–61, 13 P.3d 1065 (2000).

### b. Analysis

Here, Marshall claims retaliation based on her complaint to UCIRO in August 2018 about discrimination. Making a discrimination complaint is a protected activity and Marshall later suffered an adverse employment action. The question is whether she can establish a causal connection between the activity and the adverse action.

Marshall argues that any conduct toward her and any employment action that occurred after she made the complaint to UCIRO in August 2018 can be attributed to retaliation. However, Marshall presents no evidence that the UCIRO complaint was related in any way to this conduct and actions. Nothing in the record shows that anyone associated with UWT was upset by the UCIRO complaint or ever mentioned the complaint. Marshall has presented no evidence or even an inference that UWT actors were substantially motivated by retaliation. Instead, Marshall argues that her adverse employment decisions were motivated by racial bias that preceded her UCIRO claim.

We hold that the trial court did not err in granting summary judgment in favor of UWT regarding Marshall's WLAD retaliation claim.

### E. TENURE AS A REMEDY

Marshall argues that the trial court has the power to grant tenure as an equitable remedy for her racial discrimination claims. We decline to address this issue.

Marshall requests granting tenure as a remedy because she asserts that tenure was incorrectly denied because of racial discrimination. But there is no indication that the trial court ruled on this issue. And the issue will not be ripe unless a jury finds in Marshall's favor on her racial discrimination claim. Therefore, deciding this issue at this stage would be providing an advisory opinion.

CONCLUSION

We affirm in part, reverse in part, and remand for further proceedings regarding the racial discrimination and hostile work environment claims.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

MAXA, J.

We concur:

LEE, J.

GLASGOW, C.J.